**LITE DEPALMA GREENBERG, LLC**
Bruce D. Greenberg
Two Gateway Center, Suite 1201
Newark, NJ 07102
Telephone: (973) 623-3000
Fax: (973) 623-0858
E-mail: bgreenberg@litedepalma.com

*Attorneys for Plaintiffs (Additional Counsel on Signature Page)*

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

<u>**DOCUMENT ELECTRONICALLY FILED**</u>

| | |
|---|---|
| ROBERT AVNET, BRENDA BENNETT, GINA BIGLIONE, GEOFFREY BIXLER, CHRISTOPHER DANTININE, BRIAN EBERHARD, DEAN FENTON, JEFF GERON, MIRANDA GROH, KIMBERLY GROVER, MICHELLE HAAKENSON, KYRIN HALL, RONALD HARRIS, JOHN HASLET, LINDA HATALA, JOSEPH HENNESSY, ANGELA HENRY, HEIDI HIGHLAND, MARY HOLLIS, NICOLE HOLMBERG, DARREN HUBER, WILLIAM HYSONG, JAMES JONES, TAMMY JOYCE, TINA KOVAL, KEVIN KRESS, JENIFER KWIATKOWSKI, JENNIFER LASKA, MELISSA MAGOON, KAREN MCCONNELL, SARAH MCDONALD, LISA MENEILLY, KATHLEEN MURPHY, SHANNON MURRAY, BRENDAN O'MALLEY, CARMEN OTUS, BLAINE PALMER, REBECCA ROBERTSON, JAMES ROSS, MATTHEW RYAN, SHANNON SCOUTEN, RONALD SULLIVAN, GARY USSELMANN, JAMES VANDERMEER, and BENJAMIN WILLIS, <br><br> PLAINTIFFS, <br><br> v. <br><br> ABBOTT SEVERANCE PAY PLAN FOR EMPLOYEES OF KOS PHARMACEUTICALS, <br><br> DEFENDANT. | : : : : : : : : : : : : : : : : : : : : : : : <br><br> **Civil Action No.:** <br><br> **COMPLAINT** |

-1-

This action is brought pursuant to the Employee Retirement Income Security Act ("ERISA").

The action seeks benefits pursuant to the provisions of an employee benefit plan governed by ERISA.

Pursuant to Local Rule 10.1, the following are the street addresses of each Plaintiff named above:

Robert Avnet
39 Bloomfield Road
Manalapan, NJ 07726

Brenda Bennett
3649 Atwater Hills Court
Grand Rapids, MI 49525

Gina Biglione
8491 Hackamore Road
Littleton, CO 80125

Geoffrey Bixler
1832 Bottlebrush Circle
Roseville, CA 95747

Christopher Dantinne
12821 West 85th Circle
Arvado, CO 80005

Brian Eberhard
1502 Leesburg Court
Franklin, TN 37067

Dean Fenton
14415 4th Avenue West
Lynnwood, WA 98097

Jeff Geron
601 Wakefield Street
Bowling Green, KY 42103

Miranda Groh
1415 E. Willow Drive
Marion, IL 62959

Kimberly Grover
2340 Lincolnwood Drive
Evanson, IL 60201

Michelle Haakenson
18644 85th Avenue North
Maple Grove, MN 55311

Kyrin Hall
1920 62nd Street SE
Auburn, WA 98092

Ronald Harris
1382 Holmer Smith Rd.
Whitewright, TX 75491

John Haslet
241 Alpine Drive, SW
Leesburg, VA 20175

Linda Hatala
111 Lochwood East Dr.
Cary, NC 27518

Joseph Hennessy
8636 Pepper Ridge Circle
Sylvania, OH 43560

Angela Henry
3602 Shadow Cove Court
Houston, TX 77082

Heidi Highland
3811 A. Evanston Avenue N
Seattle, WA 98103

Mary Hollis
64 Chelsea Place
Winston, VT 05495

Nicole Holmberg
34 Lark Bunting
Littleton, CO 80127

Darren Huber
2609 Cherry Sage Drive
Flower Mound, TX 75022

William Hysong
2885 Claussen Road
Florence, SC 29505

James Kevin Jones
7704 Dan Kestner Drive
Nashville, TN 35221

Tammy Joyce
103 Glenrose Lane
Cary, NC 27518

Tina Koval
675 Bowker Street SE
Lacey, WA 98503

Kevin Kress
2915 Fox Den Circle
Lincoln, CA 95648

Jenifer Kwiatkoski
1850 Bassett Street, #918
Denver, CO 80202

| | | |
|---|---|---|
| Jennifer Laska<br>4365 Eleda Street<br>Culver City, Ca 90230 | Melissa Magoon<br>15935 Descansa Court<br>Morgan Hill, CA 95037 | Karen McConnell<br>28637 Sutherlin Lane<br>Eugene, OR 97405 |
| Sarah McDonald<br>100 Tattlers Trail<br>Irmo, SC 29063 | Lisa Meneilly<br>85 East Lake Avenue<br>Massapequa Park, NY 11762 | Kathleen Murphy<br>43226 Beconbree Ter.<br>Ashburn, VA 20148 |
| Shannon Murray<br>363 Stefan Drive<br>Charleston, SC 29412 | Brendan O'Malley<br>804 Longfield Road<br>Erdenheim, PA 19038 | Carmen Otus<br>6281 New Haven Lane<br>Vallejo, CA 94591 |
| Blaine Palmer<br>138 Turtle Pond Rd.<br>Bainbridge, GA 39819 | Rebecca Robertson<br>230 Bentley Drive<br>Zionsville, IN 46077 | James Ross<br>117 Meadowcreek Rd.<br>Coppell, TX 75019 |
| Matthew Ryan<br>RR2 Box 2183<br>Factoryville, PA 18419 | Shannon Scouten<br>25614 Mesa Ranch<br>San Antonio, TX 78258 | Ronald Sullivan<br>132 Valley Station Dr.<br>Somerset, KY 42503 |
| Gary Ussleman<br>130 13th Street<br>Breeze, IL 62230 | James Vandermeer<br>14 Claire Drive<br>Bridgewater, NJ 08807 | Benjamin Willis<br>112 Parliament Road<br>Maylene, AL 35114 |

## JURISDICTION

1.     This Court has subject matter jurisdiction pursuant to the Employee Retirement

Income Security Act, 29 U.S.C. §1001, et seq. ("ERISA"), including 29 U.S.C. §1132(e).

## VENUE

2.     Venue is appropriate in this District.  The Plan was created and  administered in this

District, the breach occurred in this District, the Defendant may be found in this District, and except

to the extent pre-empted by federal law, is governed by the laws of New Jersey. Plaintiffs Avnet and

Vandermeer are citizens of this District.  The primary issues presented in this case were previously

presented to this Court in *Veltri, et al v. Abbott Severance Pay Plan for Employees of Kos*

*Pharmaceuticals.;* 2:-8cv-00915-PGS-ES. That case involved the same defendant, the same Plan, and the same legal issues. Judge Sheridan denied cross-motions for summary judgment in that case and remanded to the Plan Administrator for consideration consistent with his opinion on those cross-motions (see Doc. No. 57 and 58). Neither Judge Sheridan's opinion (Doc. No. 57) nor his Order (Doc. No. 58) closed that case. It remains pending. The Plan Administrator took an action on the remand, and Plaintiffs in that case will return to Judge Sheridan on the same issues presented in the present Complaint.

## INTRODUCTION

3.      The Plaintiffs in this case are all former sales employees of Kos Pharmaceuticals ("Kos"). Kos Pharmaceuticals was a relatively small manufacturer, distributor, and seller of specialty pharmaceutical products. Kos manufactured proprietary pharmaceutical products such as Niaspan and Advicor for the treatment of chronic cardiovascular and respiratory diseases.

4.      The products which Kos manufactured and marketed were particularly well regarded by the medical community. Partly in consequence of its highly dedicated and skillful sales force, Kos was an extremely profitable company, and by 2006 Kos had substantially increased its market position and became a takeover target for larger pharmaceutical companies. As Kos became a target for takeover by larger pharmaceutical companies, Kos recognized the need to protect its sale force in order to market its products as well as the need to protect its long term, dedicated employees from less beneficent employers in the event of a transition. Accordingly, Kos adopted and implemented the Kos Pharmaceuticals Change in Control Severance Plan. The Plan protected sales and marketing representatives in the event of a change in control of Kos. Among other things, it provided severance benefits if a Participant terminated his or her employment after a change in control for "Good

-4-

Reason." Good Reason included, but was not limited to, a reduction in base salary or a material reduction in the total cash compensation a participant was eligible to earn; a demotion; a significant reduction in job responsibilities or significant changes in reporting relationships; or changes in principal place of employment from the current place of employment to a location more than 50 miles from a sales employee's home.  A copy of the Plan as originally adopted in November, 2006 is attached as Exhibit A.

5.        Abbott Laboratories ("Abbott") purchased Kos Pharmaceuticals in December 2006. All former Kos employees, including Plaintiffs, became employees of Abbott or one of its subsidiaries. Pursuant to the provisions of the transaction agreement between Abbott, Kos, and other entities involved in the transaction, Abbott agreed to maintain and administer the severance benefits for any employees who were employed by Kos on December 15, 2006.  In addition, the Plan provided that the Plan could not be amended" at any time in a manner that is adverse to a Participant without the prior written consent of such participant."

6.        On December 15, 2006, the Kos Pharmaceuticals Change in Control Severance Plan was renamed and restated as the "Abbott Severance Pay Plan for Employees of Kos Pharmaceuticals." The Plan is the Defendant in this case.  The Amended and Restated Plan is attached as Exhibit B.  The Plan as originally adopted  provided that the Plan could not be amended  "any time in a manner that is adverse to a Participant without the prior written consent of such participant." (Exhibit A, Section 14.)

7.        Plaintiffs have ended their employment relationship with Abbott for good reason, either because their new sales positions are more than 50 miles from their home, their cash

-5-

compensation was materially reduced, their job responsibilities were reduced, or for other Good

Reason or combination of Good Reasons defined by the Plan.

8.      Each Plaintiff has made an application for benefits pursuant to the provisions of the

Severance Pay Plan.

9.      Each Plaintiff was denied benefits.

10.     Each Plaintiff filed an appeal of the denial of benefits to the Plan Administrator.

11.     The Appeal of each Plaintiff was denied benefits by the Plan Administrator.

12.     Each Plaintiff has exhausted all administrative remedies available pursuant to the

provisions of the Plan or required by the Plan.

## FACTS

13.     The Abbott Severance Pay Plan for Employees of Kos Pharmaceuticals is an employee

welfare benefit plan as described in ERISA, 29 U.S.C. §1002(2)(B).

14.     The Kos Pharmaceuticals Change in Control Severance Plan, now known as the

Abbott Severance Pay Plan for Employees of Kos Pharmaceuticals, was designed to protect

employees of Kos who had provided years of dedicated service to Kos from the whims of any new

employer that might purchase Kos. The Plan was for the benefit of Kos as an organization and inured

to the benefit of its shareholders and, indeed, inured to the benefit of its subsequent purchasers.

Primarily, however, the Plan was for the benefit of the employees of Kos.

15.     The Plan was originally adopted in November, 2006.  After Kos was purchased by

Abbott, the Plan was amended and restated. The amended and restated Plan changed a significant

provision to the Plan.  The Amended and Restated Plan provided that the Plan Administrator would

have discretionary authority to review claims for benefits. (Exhibit B, paragraph XXI) This change

to the Plan was adverse to the participants in the Plan.  The participants did not consent in writing to the change to terms of the Plan.

16.     The Plan is administered by Abbott.

17.     Plan benefits are paid directly from the general assets of Abbott Laboratories.

18.     The Plan provides benefits to a limited class of Abbott Laboratories employees, specifically, employees who were employed by Kos on December 15, 2006.

19.     The Plaintiffs are entitled to benefits in accordance with the provisions of the Plan. Each Plaintiff terminated his or her employment for "Good Reason" as defined by the Plan, because Abbott either:

(i)     reduced the base salary by more than 10 percent or materially reduced the total cash compensation a Participant was eligible to earn;

(ii)    demoted the Participant, significantly reduced the Participant's job responsibilities, or significantly changed the Participant's reporting relationships; or;

(iii)   changed the principal location of a Participant's employment to a location more than 50 miles from the Participant's current home.

20.     The Plan provides significant monetary benefits for Plaintiffs. The Plan was designed to provide replacement income during the severance period, and provided that sales personnel employees would receive from 39 weeks to 45 weeks of salary and additional amounts based upon bonuses and other consideration. In addition, the Plan allowed participants to continue coverage under the other employee benefit plans sponsored by Abbott, including medical, dental, and vision coverage, flexible spending accounts, employee life insurance, accidental death and dismemberment insurance, and the employee assistance plan. These benefits were in addition to any benefits mandated by law.

## ROBERT AVNET
### Material Reduction in Total Cash Compensation

21.     Robert Avnet worked for Kos Pharmaceuticals.  While employed by Kos, the cash compensation which he earned was based in part upon his ability to convince the doctors upon whom he called to prescribe Kos products.  Avnet worked to establish relationships with doctors and while employed at Kos was able to call upon doctors he knew, with whom he had established relationships, and to whom he was able to consistently sell products.  Avnet was a consistent high producer of sales.  Following the acquisition of Kos by Abbott, Avnet's established accounts, territory and product line were stripped from him.  As a result of the realignment of the sales force, he suffered a material reduction in his cash compensation, exceeding 10%.  Therefore, Avnet terminated his employment for this Good Reason and/or other Good Reason as provided by the Plan.

## BRENDA BENNETT
### Material Reduction in Total Cash Compensation & Change in Job
### Responsibilities/Reporting Structure/Demotion

22.     Brenda Bennett worked for Kos Pharmaceuticals.  While employed by Kos, the cash compensation which she earned was based in part upon her ability to convince the doctors upon whom she called to prescribe Kos products.  Bennett worked to establish relationships with doctors and while employed at Kos was able to call upon doctors she knew, with whom she had established relationships, and to whom she was able to consistently sell products.  Bennett was a consistent high producer of sales.  Following the acquisition of Kos by Abbott, Bennett's established accounts, territory and product line were stripped from her.  As a result of the realignment of the sales force, she suffered a material reduction in her cash compensation, exceeding 10%. Moreover, Bennett had been a cardiovascular sales specialist (CSS) while employed at Kos, a position that is earned by

-8-

experience within the pharmaceutical industry and strong sales background.  As such, she called upon specialty physicians.  She was demoted by Abbott to a lipid sales specialist (LSS), an entry level sales position.  Not only did this decrease her ability to generate commissions, but it was also a significant reduction in her job responsibilities, affecting both her future employment opportunities and her income potential.  As such, Bennett terminated her employment for these "Good Reasons" and/or other Good Reason as provided by the Plan.

### GINA BIGLIONE
### Material Reduction in Total Cash Compensation

23.      Gina Biglione worked for Kos Pharmaceuticals.  While employed by Kos, the cash compensation which she earned was based in part upon her ability to convince the doctors upon whom she called to prescribe Kos products.  Biglione worked to establish relationships with doctors and while employed at Kos was able to call upon doctors she knew, with whom she had established relationships, and to whom she was able to consistently sell products.  Biglione was a consistent high producer of sales.  Following the acquisition of Kos by Abbott, Biglione's established accounts, territory and product line were stripped from her.  As a result of the realignment of the sales force, she suffered a material reduction in her cash compensation, exceeding 10%.  Therefore, Biglione terminated her employment for this Good Reason and/or other Good Reason as provided by the Plan.

### GEOFFREY BIXLER
### Material Reduction in Total Cash Compensation & Change in Job
### Responsibilities/Reporting Structure/Demotion

24.      Geoffrey Bixler worked for Kos Pharmaceuticals.  While employed by Kos, the cash compensation which he earned was based in part upon his ability to convince the doctors upon whom he called to prescribe Kos products.  Bixler worked to establish relationships with doctors and while

employed at Kos was able to call upon doctors he knew, with whom he had established relationships, and to whom he was able to consistently sell products. Bixler was a consistent high producer of sales. Following the acquisition of Kos by Abbott, Bixler's established accounts, territory and product line were stripped from him. As a result of the realignment of the sales force, he suffered a material reduction in his cash compensation, exceeding 10%. Moreover, Bixler had been a cardiovascular sales specialist (CSS) while employed at Kos, a position that is earned by experience within the pharmaceutical industry and strong sales background. As such, he called upon specialty physicians. He was demoted by Abbott to a lipid sales specialist (LSS), an entry level sales position. Not only did this decrease his ability to generate commissions, but it was also a significant reduction in his job responsibilities, affecting both his future employment opportunities and his income potential. As such, Bixler terminated his employment for these "Good Reasons" and/or other Good Reason as provided by the Plan.

### CHRISTOPHER DANTININE
**Material Reduction in Total Cash Compensation**

25.     Christopher Dantinine worked for Kos Pharmaceuticals. While employed by Kos, the cash compensation which he earned was based in part upon his ability to convince the doctors upon whom he called to prescribe Kos products. Dantinine worked to establish relationships with doctors and while employed at Kos was able to call upon doctors he knew, with whom he had established relationships, and to whom he was able to consistently sell products. Dantinine was a consistent high producer of sales. Following the acquisition of Kos by Abbott, Dantinine's established accounts, territory and product line were stripped from him. As a result of the realignment of the sales force, he suffered a material reduction in his cash compensation, exceeding

10%.  Therefore, Dantinine terminated his employment for this Good Reason and/or other Good Reason as provided by the Plan.

## BRIAN EBERHARD
### Material Reduction in Total Cash Compensation & Change in Job Responsibilities/Reporting Structure/Demotion

26.     Brian Eberhard worked for Kos Pharmaceuticals.  While employed by Kos, the cash compensation which he earned was based in part upon his ability to convince the doctors upon whom he called to prescribe Kos products.  Eberhard worked to establish relationships with doctors and while employed at Kos was able to call upon doctors he knew, with whom he had established relationships, and to whom he was able to consistently sell products.  Eberhard was a consistent high producer of sales.  Following the acquisition of Kos by Abbott, Eberhard's established accounts, territory and product line were stripped from him.  As a result of the realignment of the sales force, he suffered a material reduction in his cash compensation, exceeding 10%.  Moreover, Eberhard had been a cardiovascular sales specialist (CSS) while employed at Kos, a position that is earned by experience within the pharmaceutical industry and strong sales background.  As such, he called upon specialty physicians.  He was demoted by Abbott to a lipid sales specialist (LSS), an entry level sales position.  Not only did this decrease his ability to generate commissions, but it was also a significant reduction in his job responsibilities, affecting both his future employment opportunities and his income potential.  As such, Eberhard terminated his employment for these "Good Reasons" and/or other Good Reason as provided by the Plan.

-11-

## DEAN FENTON
### Material Reduction in Total Cash Compensation & Change in Job Responsibilities/Reporting Structure/Demotion

27.     Dean Fenton worked for Kos Pharmaceuticals.  While employed by Kos, the cash compensation which he earned was based in part upon his ability to convince the doctors upon whom he called to prescribe Kos products.  Fenton worked to establish relationships with doctors and while employed at Kos was able to call upon doctors he knew, with whom he had established relationships, and to whom he was able to consistently sell products.  Fenton was a consistent high producer of sales.  Following the acquisition of Kos by Abbott, Fenton's established accounts, territory and product line were stripped from him.  As a result of the realignment of the sales force, he suffered a material reduction in his cash compensation, exceeding 10%.  Moreover, Fenton had been a cardiovascular sales specialist (CSS) while employed at Kos, a position that is earned by experience within the pharmaceutical industry and strong sales background.   As such he called upon specialty physicians.  He was demoted by Abbott to a lipid sales specialist (LSS), an entry level sales position.  Not only did this decrease his ability to generate commissions, but it was also a significant reduction in his job responsibilities, affecting both his future employment opportunities and his income potential.  As such, Fenton terminated his employment for these "Good Reasons" and/or other Good Reason as provided by the Plan.

## JEFF GERON
### Material Reduction in Total Cash Compensation, Change in Job Responsibilities/Reporting Structure/Demotion, & Change of Territory Exceeding 50 Miles

28.     Jeff Geron worked for Kos Pharmaceuticals.  While employed by Kos, the cash compensation which he earned was based in part upon his ability to convince the doctors upon whom he called to prescribe Kos products.  Geron worked to establish relationships with doctors and

-12-

while employed at Kos was able to call upon doctors he knew, with whom he had established relationships, and to whom he was able to consistently sell products.  Geron was a consistent high producer of sales.  Following the acquisition of Kos by Abbott, Geron's established accounts, territory and product line were stripped from him.  As a result of the realignment of the sales force, he suffered a material reduction in his cash compensation, exceeding 10%.  Moreover, Geron had been a cardiovascular sales specialist (CSS) while employed at Kos, a position that is earned by experience within the pharmaceutical industry and strong sales background.  As such, he called upon specialty physicians.  He was demoted by Abbott to a lipid sales specialist (LSS), an entry level sales position.  Not only did this decrease his ability to generate commissions, but it was also a significant reduction in his job responsibilities, affecting both his future employment opportunities and his income potential.  Finally, after Kos was purchased by Abbott, Geron was assigned a new territory.  The average distances of the doctors that he was required to call upon in the new territory exceeded 50 miles from his principal residence.   As such, Geron terminated his employment for these "Good Reasons" and/or other Good Reason as provided by the Plan.

## MIRANDA GROH
**Material Reduction in Total Cash Compensation, Change in Job Responsibilities/Reporting Structure/Demotion, & Change of Territory Exceeding 50 Miles**

29.     Miranda Groh worked for Kos Pharmaceuticals.  While employed by Kos, the cash compensation which she earned was based in part upon her ability to convince the doctors upon whom she called to prescribe Kos products.  Groh worked to establish relationships with doctors and while employed at Kos was able to call upon doctors she knew, with whom she had established relationships, and to whom she was able to consistently sell products.  Groh was a consistent high producer of sales. Following the acquisition of Kos by Abbott, Groh's established accounts, territory

and product line were stripped from her.  As a result of the realignment of the sales force, she suffered a material reduction in her cash compensation, exceeding 10%.  Moreover, Groh had been a cardiovascular sales specialist (CSS) while employed at Kos, a position that is earned by experience within the pharmaceutical industry and strong sales background.  As such she called upon specialty physicians.  She was demoted by Abbott to a lipid sales specialist (LSS), an entry level sales position. Not only did this decrease her ability to generate commissions, but it was also a significant reduction in her job responsibilities, affecting both her future employment opportunities and her income potential.   Finally, after Kos was purchased by Abbott, Groh was assigned a new territory.  The average distances of the doctors that she was required to call upon in the new territory exceeded 50 miles from her principal residence.   As such, Groh terminated her employment for these "Good Reasons" and/or other Good Reason as provided by the Plan.

### KIMBERLY GROVER
### Material Reduction in Total Cash Compensation

30.     Kimberly Grover worked for Kos Pharmaceuticals.  While employed by Kos, the cash compensation which she earned was based in part upon her ability to convince the doctors upon whom she called to prescribe Kos products.  Grover worked to establish relationships with doctors and while employed at Kos was able to call upon doctors she knew, with whom she had established relationships, and to whom she was able to consistently sell products.  Grover was a consistent high producer of sales.  Following the acquisition of Kos by Abbott, Grover's established accounts, territory and product line were stripped from her. As a result of the realignment of the sales force, she suffered a material reduction in her cash compensation, exceeding 10%.  Therefore, Grover

terminated her employment for this "Good Reason" and/or other Good Reason as provided by the Plan.

## MICHELLE HAAKENSON
### Change of Territory Exceeding 50 Miles

31.    Michelle Haakenson worked for Kos Pharmaceuticals.  While employed by Kos, the cash compensation which she earned was based in part upon her ability to convince the doctors upon whom she called to prescribe Kos products.  Haakenson worked to establish relationships with doctors and while employed at Kos was able to call upon doctors she knew, with whom she had established relationships, and to whom she was able to consistently sell products.  Haakenson was a consistent high producer of sales.  After Kos was purchased by Abbott, Haakenson was assigned a new territory.  The average distances of the doctors that she was required to call upon in the new territory exceeded 50 miles from her principal residence. In fact, the average distance was in excess of 70 miles.  As such, Haakenson terminated her employment for this "Good Reason" and/or other Good Reason as provided by the Plan.

## KYRIN HALL
### Material Reduction in Total Cash Compensation

32.    Kyrin Hall worked for Kos Pharmaceuticals.  While employed by Kos, the cash compensation which she earned was based in part upon her ability to convince the doctors upon whom she called to prescribe Kos products.  Hall worked to establish relationships with doctors and while employed at Kos was able to call upon doctors she knew, with whom she had established relationships, and to whom she was able to consistently sell products.  Hall was a consistent high producer of sales.  Following the acquisition of Kos by Abbott, Hall's established accounts, territory

and product line were stripped from her.  As a result of the realignment of the sales force, she suffered a material reduction in her cash compensation, exceeding 10%.  Therefore, Hall terminated her employment for this "Good Reason" and/or other Good Reason as provided by the Plan.

### RONALD HARRIS
### Material Reduction in Total Cash Compensation & Change in Job Responsibilities/Reporting Structure/Demotion

33.     Ronald Harris worked for Kos Pharmaceuticals.  While employed by Kos, the cash compensation which he earned was based in part upon his ability to convince the doctors upon whom he called to prescribe Kos products.  Harris worked to establish relationships with doctors and while employed at Kos was able to call upon doctors he knew, with whom he had established relationships, and to whom he was able to consistently sell products.  Harris was a consistent high producer of sales.  Following the acquisition of Kos by Abbott, Harris's established accounts, territory and product line were stripped from him.  As a result of the realignment of the sales force, he suffered a material reduction in his cash compensation, exceeding 10%.  Moreover, Harris had been a cardiovascular sales specialist (CSS) while employed at Kos, a position that is earned by experience within the pharmaceutical industry and strong sales background.  As such he called upon specialty physicians.  He was demoted by Abbott to a lipid sales specialist (LSS), an entry level sales position.  Not only did this decrease his ability to generate commissions, but it was also a significant reduction in his job responsibilities, affecting both his future employment opportunities and his income potential.  As such, Harris terminated his employment for these "Good Reasons" and/or other Good Reason as provided by the Plan.

-16-

## JOHN HASLET
### Material Reduction in Total Cash Compensation & Change in Job
### Responsibilities/Reporting Structure/Demotion

34.     John Haslet worked for Kos Pharmaceuticals.  While employed by Kos, the cash compensation which he earned was based in part upon his ability to convince the doctors upon whom he called to prescribe Kos products.  Haslet worked to establish relationships with doctors and while employed at Kos was able to call upon doctors he knew, with whom he had established relationships, and to whom he was able to consistently sell products.  Haslet was a consistent high producer of sales.  Following the acquisition of Kos by Abbott, Haslet's established accounts, territory and product line were stripped from him.  As a result of the realignment of the sales force, he suffered a material reduction in his cash compensation, exceeding 10%.  Moreover, following the acquisition of Kos by Abbott, a significant change occurred in Haslet's reporting structure.  Mr. Haslet's first level supervisor was changed, the location of his first level supervisor was changed, and a new level of management was implemented between Mr. Haslet's position and the Vice President of Sales.  As such, Mr. Haslet terminated his employment for these "Good Reasons" and/or other Good Reason as provided by the Plan.

## LINDA HATALA
### Material Reduction in Total Cash Compensation & Change in Job
### Responsibilities/Reporting Structure/Demotion

35.     Linda Hatala worked for Kos Pharmaceuticals.  While employed by Kos, the cash compensation which she earned was based in part upon her ability to convince the doctors upon whom she called to prescribe Kos products.  Hatala worked to establish relationships with doctors and while employed at Kos was able to call upon doctors she knew, with whom she had established relationships, and to whom she was able to consistently sell products.  Hatala was a consistent high

-17-

producer of sales. Following the acquisition of Kos by Abbott, Hatala's established accounts, territory and product line were stripped from her. As a result of the realignment of the sales force, she suffered a material reduction in her cash compensation, exceeding 10%. Moreover, Hatala had been a cardiovascular sales specialist (CSS) while employed at Kos, a position that is earned by experience within the pharmaceutical industry and strong sales background. As such she called upon specialty physicians. She was demoted by Abbott to a lipid sales specialist (LSS), an entry level sales position. Not only did this decrease her ability to generate commissions, but it was also a significant reduction in her job responsibilities, affecting both her future employment opportunities and her income potential. As such, Hatala terminated her employment for these "Good Reasons" and/or other Good Reason as provided by the Plan.

**JOSEPH HENNESSY**
**Material Reduction in Total Cash Compensation & Change in Job**
**Responsibilities/Reporting Structure/Demotion**

36.     Joseph Hennessy worked for Kos Pharmaceuticals. While employed by Kos, the cash compensation which he earned was based in part upon his ability to convince the doctors upon whom he called to prescribe Kos products. Hennessy worked to establish relationships with doctors and while employed at Kos was able to call upon doctors he knew, with whom he had established relationships, and to whom he was able to consistently sell products. Hennessy was a consistent high producer of sales. Following the acquisition of Kos by Abbott, Hennessy's established accounts, territory and product line were stripped from him. As a result of the realignment of the sales force, he suffered a material reduction in his cash compensation, exceeding 10%. Moreover, at the time of Abbott's acquisition of Kos, Hennessy was employed by Kos as a senior district manager. At Kos, Hennessy directly reported to a Regional Director, who in turn reported to Vice President of Sales.

-18-

Following the acquisition by Abbott, Hennessy reported to a Regional Manager, who reported to a Regional (Area) Director, who then reported to Vice President of Sales. Additionally, following Abbott's acquisition of Kos, Hennessy's job responsibilities were substantially reduced. At Kos, Hennessy was a senior district manager who was assigned complete control for the Michigan Medicaid Program. He was also responsible for meeting and contracting with all commercial Health Plans in the State of Michigan, which resulted in direct contact and quarterly meetings with the Vice President and National Director of Kos. This, however, was not so at Abbott. Following Abbott's acquisition, Hennessy was not even allowed to call upon cardiologists (Hennessy was part of the founding sales personnel at Kos who exclusively called upon cardiologists) and was also stripped of the Managed Care Account and Medicaid Plan responsibilities. This constituted a significant change in Hennessy's reporting structure, job responsibilities, and was a demotion. As such, Hennessy terminated his employment for these "Good Reasons" and/or other Good Reason as provided by the Plan.

## ANGELA HENRY
### Material Reduction in Total Cash Compensation

37. Angela Henry worked for Kos Pharmaceuticals. While employed by Kos, the cash compensation which she earned was based in part upon her ability to convince the doctors upon whom she called to prescribe Kos products. Henry worked to establish relationships with doctors and while employed at Kos was able to call upon doctors she knew, with whom she had established relationships, and to whom she was able to consistently sell products. Henry was a consistent high producer of sales. Following the acquisition of Kos by Abbott, Henry's established accounts, territory and product line were stripped from her. As a result of the

realignment of the sales force, she suffered a material reduction in her cash compensation, exceeding 10%.  As such, Henry terminated her employment for these "Good Reasons" and/or other Good Reason as provided by the Plan.

## HEIDI HIGHLAND
### Material Reduction in Total Cash Compensation

38.     Heidi Highland worked for Kos Pharmaceuticals.  While employed by Kos, the cash compensation which she earned was based in part upon her ability to convince the doctors upon whom she called to prescribe Kos products.  Heighland worked to establish relationships with doctors and while employed at Kos was able to call upon doctors she knew, with whom she had established relationships, and to whom she was able to consistently sell products.  Highland was a consistent high producer of sales.  Following the acquisition of Kos by Abbott, Highland's established accounts, territory and product line were stripped from her.  As a result of the realignment of the sales force, she suffered a material reduction in her cash compensation, exceeding 10%.  As such, Highland terminated her employment for these "Good Reasons" and/or other Good Reason as provided by the Plan.

## MARY HOLLIS
### Change in Job Responsibilities/Reporting Structure/Demotion, & Change of Territory Exceeding 50 Miles

39.     Mary Hollis worked for Kos Pharmaceuticals.  While employed by Kos, the cash compensation which she earned was based in part upon her ability to convince the doctors upon whom she called to prescribe Kos products.  Hollis worked to establish relationships with doctors and while employed at Kos was able to call upon doctors she knew, with whom she had established relationships, and to whom she was able to consistently sell products.  Hollis was a

consistent high producer of sales.  Hollis had been a cardiovascular sales specialist (CSS) while employed at Kos, a position that is earned by experience within the pharmaceutical industry and strong sales background.  As such she called upon specialty physicians.  She was demoted by Abbott to a lipid sales specialist (LSS), an entry level sales position.  Not only did this decrease her ability to generate commissions, but it was also a significant reduction in her job responsibilities, affecting both her future employment opportunities and her income potential. Finally, after Kos was purchased by Abbott, Hollis was assigned a new territory.  The average distances of the doctors that she was required to call upon in the new territory exceeded 50 miles from her principal residence.   As such, Hollis terminated her employment for these "Good Reasons" and/or other Good Reason as provided by the Plan.

### NICOLE HOLMBERG
### Material Reduction in Total Cash Compensation

40.     Nicole Holmberg worked for Kos Pharmaceuticals.  While employed by Kos, the cash compensation which she earned was based in part upon her ability to convince the doctors upon whom she called to prescribe Kos products.  Holmberg worked to establish relationships with doctors and while employed at Kos was able to call upon doctors she knew, with whom she had established relationships, and to whom she was able to consistently sell products.  Holmberg was a consistent high producer of sales.  Following the acquisition of Kos by Abbott, Holmberg's established accounts, territory and product line were stripped from her.  As a result of the realignment of the sales force, she suffered a material reduction in her cash compensation, exceeding 10%.   As such, Holmberg terminated her employment for these "Good Reasons" and/or other Good Reason as provided by the Plan.

## DARREN HUBER
### Material Reduction in Total Cash Compensation & Change in Job Responsibilities/Reporting Structure/Demotion

41.     Darren Huber worked for Kos Pharmaceuticals.  While employed by Kos, the cash compensation which he earned was based in part upon his ability to convince the doctors upon whom he called to prescribe Kos products.  Huber worked to establish relationships with doctors and while employed at Kos was able to call upon doctors he knew, with whom he had established relationships, and to whom he was able to consistently sell products.  Huber was a consistent high producer of sales.  Following the acquisition of Kos by Abbott, Hubert's established accounts, territory and product line were stripped from him.  As a result of the realignment of the sales force, he suffered a material reduction in his cash compensation, exceeding 10%. Moreover, Huber had been a cardiovascular sales specialist (CSS) while employed at Kos, a position that is earned by experience within the pharmaceutical industry and strong sales background.  As such he called upon specialty physicians.  He was demoted by Abbott to a lipid sales specialist (LSS), an entry level sales position.  Not only did this decrease his ability to generate commissions, but it was also a significant reduction in his job responsibilities, affecting both his future employment opportunities and his income potential.  As such, Huber terminated his employment for these "Good Reasons" and/or other Good Reason as provided by the Plan.

## WILLIAM HYSONG
### Material Reduction in Total Cash Compensation

42.     William Hysong worked for Kos Pharmaceuticals.  While employed by Kos, the cash compensation which he earned was based in part upon his ability to convince the doctors upon whom he called to prescribe Kos products.  Hysong worked to establish relationships with

doctors and while employed at Kos was able to call upon doctors he knew, with whom he had

established relationships, and to whom he was able to consistently sell products.  Hysong was a

consistent high producer of sales.  Following the acquisition of Kos by Abbott, Hysong's

established accounts, territory and product line were stripped from him.  As a result of the

realignment of the sales force, he suffered a material reduction in his cash compensation,

exceeding 10%. As such, Mr. Hysong terminated his employment for these "Good Reasons"

and/or other Good Reason as provided by the Plan.

### JAMES KEVIN JONES
### Material Reduction in Total Cash Compensation & Change in Job Responsibilities/Reporting Structure/Demotion

43.     James Jones worked for Kos Pharmaceuticals.  While employed by Kos, the cash

compensation which he earned was based in part upon his ability to convince the doctors upon

whom he called to prescribe Kos products.  Jones worked to establish relationships with doctors

and while employed at Kos was able to call upon doctors he knew, with whom he had established

relationships, and to whom he was able to consistently sell products.  Jones was a consistent high

producer of sales.  Following the acquisition of Kos by Abbott, Jones' established accounts,

territory and product line were stripped from him.  As a result of the realignment of the sales

force, he suffered a material reduction in his cash compensation, exceeding 10%.  Moreover,

Jones had been a cardiovascular sales specialist (CSS) while employed at Kos, a position that is

earned by experience within the pharmaceutical industry and strong sales background.  As such he

called upon specialty physicians.  He was demoted by Abbott to a lipid sales specialist (LSS), an

entry level sales position.  Not only did this decrease his ability to generate commissions, but it

was also a significant reduction in his job responsibilities, affecting both his future employment

opportunities and his income potential.  As such, Jones terminated his employment for these "Good Reasons" and/or other Good Reason as provided by the Plan.

**TAMMY JOYCE**
**Material Reduction in Total Cash Compensation & Change in Job**
**Responsibilities/Reporting Structure/Demotion**

44.      Tammy Joyce worked for Kos Pharmaceuticals.  While employed by Kos, the cash compensation which she earned was based in part upon her ability to convince the doctors upon whom she called to prescribe Kos products.  Joyce worked to establish relationships with doctors and while employed at Kos was able to call upon doctors she knew, with whom she had established relationships, and to whom she was able to consistently sell products.  Joyce was a consistent high producer of sales.  Following the acquisition of Kos by Abbott, Joyce's established accounts, territory and product line were stripped from her.  As a result of the realignment of the sales force, she suffered a material reduction in her cash compensation, exceeding 10%.  Moreover, Joyce had been a cardiovascular sales specialist (CSS) while employed at Kos, a position that is earned by experience within the pharmaceutical industry and strong sales background.  As such she called upon specialty physicians.  She was demoted by Abbott to a lipid sales specialist (LSS), an entry level sales position.  Not only did this decrease her ability to generate commissions, but it was also a significant reduction in her job responsibilities, affecting both her future employment opportunities and her income potential.  As such, Joyce terminated her employment for these "Good Reasons" and/or other Good Reason as provided by the Plan.

## TINA KOVAL
### Material Reduction in Total Cash Compensation

45.     Tina Koval worked for Kos Pharmaceuticals.  While employed by Kos, the cash compensation which she earned was based in part upon her ability to convince the doctors upon whom she called to prescribe Kos products.  Koval worked to establish relationships with doctors and while employed at Kos was able to call upon doctors she knew, with whom she had established relationships, and to whom she was able to consistently sell products.  Koval was a consistent high producer of sales.  Following the acquisition of Kos by Abbott, Koval's established accounts, territory and product line were stripped from her.  As a result of the realignment of the sales force, she suffered a material reduction in her cash compensation, exceeding 10%.   As such, Koval terminated her employment for these "Good Reasons" and/or other Good Reason as provided by the Plan.

## KEVIN KRESS
### Material Reduction in Total Cash Compensation & Change in Job Responsibilities/Reporting Structure/Demotion

46.     Kevin Kress worked for Kos Pharmaceuticals.  While employed by Kos, the cash compensation which he earned was based in part upon his ability to convince the doctors upon whom he called to prescribe Kos products.  Kress worked to establish relationships with doctors and while employed at Kos was able to call upon doctors he knew, with whom he had established relationships, and to whom he was able to consistently sell products.  Kress was a consistent high producer of sales.  Following the acquisition of Kos by Abbott, Kress's established accounts, territory and product line were stripped from him.  As a result of the realignment of the sales force, he suffered a material reduction in his cash compensation, exceeding 10%.  Moreover,

Kress had been a cardiovascular sales specialist (CSS) while employed at Kos, a position that is earned by experience within the pharmaceutical industry and strong sales background. As such he called upon specialty physicians. He was demoted by Abbott to a lipid sales specialist (LSS), an entry level sales position. Not only did this decrease his ability to generate commissions, but it was also a significant reduction in his job responsibilities, affecting both his future employment opportunities and his income potential. As such, Kress terminated his employment for these "Good Reasons" and/or other Good Reason as provided by the Plan.

**JENIFER KWIATKOWSKI**
**Material Reduction in Total Cash Compensation & Change in Job**
**Responsibilities/Reporting Structure/Demotion**

47.     Jenifer Kwiatkowski worked for Kos Pharmaceuticals. While employed by Kos, the cash compensation which she earned was based in part upon her ability to convince the doctors upon whom she called to prescribe Kos products. Kwiatkowski worked to establish relationships with doctors and while employed at Kos was able to call upon doctors she knew, with whom she had established relationships, and to whom she was able to consistently sell products. Kwiatkowski was a consistent high producer of sales. Following the acquisition of Kos by Abbott, Kwiatkowski's established accounts, territory and product line were stripped from her. As a result of the realignment of the sales force, she suffered a material reduction in her cash compensation, exceeding 10%. Moreover, during her employment with Kos, Kwiatkowski held the position of Territory Manager. The position required calling upon specialized physicians in a multi-state territory in Nevada and Colorado. Following the acquisition of Kos by Abbott, Kwiatkowski was demoted to the position of primary care representative and was no longer allowed to call upon any physicians outside the State of Colorado. As such, Kwiatkowski

terminated her employment for these "Good Reasons" and/or other Good Reason as provided by the Plan.

## JENNIFER LASKA
### Material Reduction in Total Cash Compensation & Change in Job Responsibilities/Reporting Structure/Demotion

48.    Jennifer Laska worked for Kos Pharmaceuticals.  While employed by Kos, the cash compensation which she earned was based in part upon her ability to convince the doctors upon whom she called to prescribe Kos products.  Laska worked to establish relationships with doctors and while employed at Kos was able to call upon doctors she knew, with whom she had established relationships, and to whom she was able to consistently sell products.  Laska was a consistent high producer of sales.  Following the acquisition of Kos by Abbott, Laska's established accounts, territory and product line were stripped from her.  As a result of the realignment of the sales force, she suffered a material reduction in her cash compensation, exceeding 10%.  Moreover, Laska had been a territory manager and cardiovascular sales specialist (CSS) while employed at Kos, a position that is earned by experience within the pharmaceutical industry and strong sales background.  As such she called upon specialty physicians.  She was demoted by Abbott to a lipid sales specialist (LSS), an entry level sales position.  Not only did this decrease her ability to generate commissions, but it was also a significant reduction in her job responsibilities, affecting both her future employment opportunities and her income potential.  As such, Laska terminated her employment for these "Good Reasons" and/or other Good Reason as provided by the Plan.

## MELISSA MAGOON
### Material Reduction in Total Cash Compensation

49.     Melissa Magoon worked for Kos Pharmaceuticals.  While employed by Kos, the cash compensation which she earned was based in part upon her ability to convince the doctors upon whom she called to prescribe Kos products.  Magoon worked to establish relationships with doctors and while employed at Kos was able to call upon doctors she knew, with whom she had established relationships, and to whom she was able to consistently sell products.  Magoon was a consistent high producer of sales.  Following the acquisition of Kos by Abbott, Magoon's established accounts, territory and product line were stripped from her.  As a result of the realignment of the sales force, she suffered a material reduction in her cash compensation, exceeding 10%.  As such, Magoon terminated her employment for these "Good Reasons" and/or other Good Reason as provided by the Plan.

## KAREN MCCONNELL
### Material Reduction in Total Cash Compensation, Change in Job Responsibilities/Reporting Structure/Demotion, & Change of Territory Exceeding 50 Miles

50.     Karen McConnell worked for Kos Pharmaceuticals.  While employed by Kos, the cash compensation which she earned was based in part upon her ability to convince the doctors upon whom she called to prescribe Kos products.  McConnell worked to establish relationships with doctors and while employed at Kos was able to call upon doctors she knew, with whom she had established relationships, and to whom she was able to consistently sell products.  McConnell was a consistent high producer of sales.  Following the acquisition of Kos by Abbott, McConnell's established accounts, territory and product line were stripped from her.  As a result of the realignment of the sales force, she suffered a material reduction in her cash compensation, exceeding 10%.

Moreover, McConnell had been a cardiovascular sales specialist (CSS) while employed at Kos, a position that is earned by experience within the pharmaceutical industry and strong sales background. As such she called upon specialty physicians.  She was demoted by Abbott to a lipid sales specialist (LSS), an entry level sales position.  Not only did this decrease her ability to generate commissions, but it was also a significant reduction in her job responsibilities, affecting both her future employment opportunities and her income potential.  Finally, after Kos was purchased by Abbott, McConnell was assigned a new territory.  The average distances of the doctors that she was required to call upon in the new territory exceeded 50 miles from her principal residence.   As such, McConnell terminated her employment for these "Good Reasons" and/or other Good Reason as provided by the Plan.

### SARAH MCDONALD
### Material Reduction in Total Cash Compensation, Change in Job Responsibilities/Reporting Structure/Demotion

51.      Sarah McDonald worked for Kos Pharmaceuticals.  While employed by Kos, the cash compensation which she earned was based in part upon her ability to convince the doctors upon whom she called to prescribe Kos products.  McDonald worked to establish relationships with doctors and while employed at Kos was able to call upon doctors she knew, with whom she had established relationships, and to whom she was able to consistently sell products.  McDonald was a consistent high producer of sales.  Following the acquisition of Kos by Abbott, McDonald's established accounts, territory and product line were stripped from her.  As a result of the realignment of the sales force, she suffered a material reduction in her cash compensation, exceeding 10%.  Moreover, McDonald had been a cardiovascular sales specialist (CSS) while employed at Kos, a position that is earned by experience within the pharmaceutical industry and strong sales background.  As such, she called upon specialty physicians.  She was demoted by Abbott to a lipid sales specialist

-29-

(LSS), an entry level sales position.  Not only did this decrease her ability to generate commissions, but it was also a significant reduction in her job responsibilities, affecting both her future employment opportunities and her income potential.   As such, McDonald terminated her employment for these "Good Reasons" and/or other Good Reason as provided by the Plan.

## LISA MENEILLY
### Material Reduction in Total Cash Compensation, Change in Job Responsibilities/Reporting Structure/Demotion

52.    Lisa Meneilly worked for Kos Pharmaceuticals.  While employed by Kos, the cash compensation which she earned was based in part upon her ability to convince the doctors upon whom she called to prescribe Kos products.  Meneilly worked to establish relationships with doctors and while employed at Kos was able to call upon doctors she knew, with whom she had established relationships, and to whom she was able to consistently sell products.  Meneilly was a consistent high producer of sales.  Following the acquisition of Kos by Abbott, Meneilly's established accounts, territory and product line were stripped from her.  As a result of the realignment of the sales force, she suffered a material reduction in her cash compensation, exceeding 10%.  Moreover, Meneilly had been a cardiovascular sales specialist (CSS) while employed at Kos, a position that is earned by experience within the pharmaceutical industry and strong sales background.  As such, she called upon specialty physicians.  She was demoted by Abbott to a lipid sales specialist (LSS), an entry level sales position.  Not only did this decrease her ability to generate commissions, but it was also a significant reduction in her job responsibilities, affecting both her future employment opportunities and her income potential.   As such, Meneilly terminated her employment for these "Good Reasons" and/or other Good Reason as provided by the Plan.

## KATHLEEN MURPHY
### Material Reduction in Total Cash Compensation & Change in Job Responsibilities/Reporting Structure/Demotion

53.     Kathleen Murphy worked for Kos Pharmaceuticals. While employed by Kos, the cash compensation which she earned was based in part upon her ability to convince the doctors upon whom she called to prescribe Kos products. Murphy worked to establish relationships with doctors and while employed at Kos was able to call upon doctors she knew, with whom she had established relationships, and to whom she was able to consistently sell products. Murphy was a consistent high producer of sales. Following the acquisition of Kos by Abbott, Murphy's established accounts, territory and product line were stripped from her. As a result of the realignment of the sales force, she suffered a material reduction in her cash compensation, exceeding 10%. Moreover, following the acquisition of Kos by Abbott, a significant change occurred in Murphy's reporting structure. Murphy's first level supervisor was changed, the location of her first level supervisor was changed, and a new level of management was implemented between Murphy's position and the Vice President of Sales. As such, Murphy terminated her employment for these "Good Reasons" and/or other Good Reason as provided by the Plan.

## SHANNON MURRAY
### Material Reduction in Total Cash Compensation, Change in Job Responsibilities/Reporting Structure/Demotion

54.     Shannon Murray worked for Kos Pharmaceuticals. While employed by Kos, the cash compensation which she earned was based in part upon her ability to convince the doctors upon whom she called to prescribe Kos products. Murray worked to establish relationships with doctors and while employed at Kos was able to call upon doctors she knew, with whom she had established relationships, and to whom she was able to consistently sell products. Murray was a consistent high

producer of sales. Following the acquisition of Kos by Abbott, Murray's established accounts, territory and product line were stripped from her. As a result of the realignment of the sales force, she suffered a material reduction in her cash compensation, exceeding 10%. Moreover, Murray had been a cardiovascular sales specialist (CSS) while employed at Kos, a position that is earned by experience within the pharmaceutical industry and strong sales background. As such, she called upon specialty physicians. She was demoted by Abbott to a lipid sales specialist (LSS), an entry level sales position. Not only did this decrease her ability to generate commissions, but it was also a significant reduction in her job responsibilities, affecting both her future employment opportunities and her income potential. As such, Murray terminated her employment for these "Good Reasons" and/or other Good Reason as provided by the Plan.

### BRENDAN O'MALLEY
### Material Reduction in Total Cash Compensation & Change in Job
### Responsibilities/Reporting Structure/Demotion

55.    Brendan O'Malley worked for Kos Pharmaceuticals. While employed by Kos, the cash compensation which he earned was based in part upon his ability to convince the doctors upon whom he called to prescribe Kos products. O'Malley worked to establish relationships with doctors and while employed at Kos was able to call upon doctors he knew, with whom he had established relationships, and to whom he was able to consistently sell products. O'Malley was a consistent high producer of sales. Following the acquisition of Kos by Abbott, O'Malley's established accounts, territory and product line were stripped from him. As a result of the realignment of the sales force, he suffered a material reduction in his cash compensation, exceeding 10%. Moreover, O'Malley had been a cardiovascular sales specialist (CSS) while employed at Kos, a position that is earned by experience within the pharmaceutical industry and strong sales background. As such, he called upon

-32-

specialty physicians.  He was demoted by Abbott to a lipid sales specialist (LSS), an entry level sales

position.  Not only did this decrease his ability to generate commissions, but it was also a significant

reduction in his job responsibilities, affecting both his future employment opportunities and his income

potential.  As such, O'Malley terminated his employment for these "Good Reasons" and/or other

Good Reason as provided by the Plan.

**CARMEN OTUS**
**Material Reduction in Total Cash Compensation, Change in Job**
**Responsibilities/Reporting Structure/Demotion**

56.      Carmen Otus worked for Kos Pharmaceuticals.  While employed by Kos, the cash

compensation which she earned was based in part upon her ability to convince the doctors upon

whom she called to prescribe Kos products.  Otus worked to establish relationships with doctors and

while employed at Kos was able to call upon doctors she knew, with whom she had established

relationships, and to whom she was able to consistently sell products.  Otus was a consistent high

producer of sales.  Following the acquisition of Kos by Abbott, Otus's established accounts, territory

and product line were stripped from her.  As a result of the realignment of the sales force, she

suffered a material reduction in her cash compensation, exceeding 10%.  Moreover, Otus had been

a cardiovascular sales specialist (CSS) while employed at Kos, a position that is earned by experience

within the pharmaceutical industry and strong sales background.  As such, she called upon specialty

physicians.  She was demoted by Abbott to a lipid sales specialist (LSS), an entry level sales position.

Not only did this decrease her ability to generate commissions, but it was also a significant reduction

in her job responsibilities, affecting both her future employment opportunities and her income

potential.  Additionally, following her demotion to an LSS position at Abbott, Otus's new supervisor

encouraged her to apply for a CSS position at Abbott, recognizing that "you would be perfect for that

-33-

position. Cardiology focused . . . in the east bay . . . selling to many physicians you called on previously."   As such, Otus terminated her employment for these "Good Reasons" and/or other Good Reason as provided by the plan.

### BLAINE PALMER
**Material Reduction in Total Cash Compensation, Change in Job Responsibilities/Reporting Structure/Demotion, Change of Territory Exceeding 50 Miles**

57.   Blaine Palmer worked for Kos Pharmaceuticals.   While employed by Kos, the cash compensation which he earned was based in part upon his ability to convince the doctors upon whom he called to prescribe Kos products. Palmer worked to establish relationships with doctors and while employed at Kos was able to call upon doctors he knew, with whom he had established relationships, and to whom he was able to consistently sell products.   Palmer was a consistent high producer of sales.   Palmer had been a cardiovascular sales specialist (CSS) while employed at Kos, a position that is earned by experience within the pharmaceutical industry and strong sales background.   As such, he called upon specialty physicians.   He was demoted by Abbott to a lipid sales specialist (LSS), an entry level sales position.   Not only did this decrease his ability to generate commissions, but it was also a significant reduction in his job responsibilities, affecting both his future employment opportunities and his income potential.   Finally, after Kos was purchased by Abbott, Palmer was assigned a new territory.   The average distances of the doctors that he was required to call upon in the new territory exceeded 50 miles from his principal residence.   As such, Palmer terminated his employment for these "Good Reasons" and/or other Good Reason as provided by the Plan.

## REBECCA ROBERTSON
### Material Reduction in Total Cash Compensation, Change in Job Responsibilities/Reporting Structure/Demotion

58.     Rebecca Robertson worked for Kos Pharmaceuticals.  While employed by Kos, the cash compensation which she earned was based in part upon her ability to convince the doctors upon whom she called to prescribe Kos products.  Robertson worked to establish relationships with doctors and while employed at Kos was able to call upon doctors she knew, with whom she had established relationships, and to whom she was able to consistently sell products.  Robertson was a consistent high producer of sales.  Following the acquisition of Kos by Abbott, Robertson's established accounts, territory and product line were stripped from her.  As a result of the realignment of the sales force, she suffered a material reduction in her cash compensation, exceeding 10%.  Moreover, Robertson had been a cardiovascular sales specialist (CSS) while employed at Kos, a position that is earned by experience within the pharmaceutical industry and strong sales background.  As such, she called upon specialty physicians.  She was demoted by Abbott to a lipid sales specialist (LSS), an entry level sales position.  Not only did this decrease her ability to generate commissions, but it was also a significant reduction in her job responsibilities, affecting both her future employment opportunities and her income potential.   As such, Robertson terminated her employment for these "Good Reasons" and/or other Good Reason as provided by the plan.

## JAMES ROSS
### Material Reduction in Total Cash Compensation & Change in Job Responsibilities/Reporting Structure/Demotion

59.     James Ross worked for Kos Pharmaceuticals.  While employed by Kos, the cash compensation which he earned was based in part upon his ability to convince the doctors upon whom he called to prescribe Kos products.  Ross worked to establish relationships with doctors and while

employed at Kos was able to call upon doctors he knew, with whom he had established relationships, and to whom he was able to consistently sell products.  Ross was a consistent high producer of sales. Following the acquisition of Kos by Abbott, Ross's established accounts, territory and product line were stripped from him.   As a result of the realignment of the sales force, he suffered a material reduction in his cash compensation, exceeding 10%.  Moreover, Ross had been a cardiovascular sales specialist (CSS) while employed at Kos, a position that is earned by experience within the pharmaceutical industry and strong sales background.  As such he called upon specialty physicians. He was demoted by Abbott to a lipid sales specialist (LSS), an entry level sales position.  Following the demotion, Ross was informed by his regional manager that he was "no longer in the major leagues" but was now in a "minor league farm system."  Not only did this decrease his ability to generate commissions, but it was also a significant reduction in his job responsibilities, affecting both his future employment opportunities and his income potential.  For instance, following the demotion, Mr. Ross was no longer able to hire his own sales team.  His reporting structure was also significantly changed.  As such, Ross terminated his employment for these "Good Reasons" and/or other Good Reason as provided by the Plan.

## MATTHEW RYAN
### Change of Territory Exceeding 50 Miles

60.     Matthew Ryan worked for Kos Pharmaceuticals.  While employed by Kos, the cash compensation which he earned was based in part upon his ability to convince the doctors upon whom he called to prescribe Kos products.  Ryan worked to establish relationships with doctors and while employed at Kos was able to call upon doctors he knew, with whom he had established relationships, and to whom he was able to consistently sell products.  Ryan was a consistent high producer of sales.

After Kos was purchased by Abbott, Ryan was assigned a new territory. The average distances of the doctors that he was required to call upon in the new territory exceeded 50 miles from his principal residence. As such, Ryan terminated his employment for this "Good Reason" and/or other Good Reason as provided by the Plan.

**SHANNON SCOUTEN**
**Material Reduction in Total Cash Compensation, Change in Job**
**Responsibilities/Reporting Structure/Demotion**

61.     Shannon Scouten worked for Kos Pharmaceuticals. While employed by Kos, the cash compensation which she earned was based in part upon her ability to convince the doctors upon whom she called to prescribe Kos products. Scouten worked to establish relationships with doctors and while employed at Kos was able to call upon doctors she knew, with whom she had established relationships, and to whom she was able to consistently sell products. Scouten was a consistent high producer of sales. Following the acquisition of Kos by Abbott, Scouten's established accounts, territory and product line were stripped from her. As a result of the realignment of the sales force, she suffered a material reduction in her cash compensation, exceeding 10%. Moreover, Scouten had been a cardiovascular sales specialist (CSS) while employed at Kos, a position that is earned by experience within the pharmaceutical industry and strong sales background. As such she called upon specialty physicians. She was demoted by Abbott to a lipid sales specialist (LSS), an entry level sales position. Not only did this decrease her ability to generate commissions, but it was also a significant reduction in her job responsibilities, affecting both her future employment opportunities and her income potential. As such, Scouten terminated her employment for these "Good Reasons" and/or other Good Reason as provided by the plan.

-37-

## RONALD SULLIVAN
### Material Reduction in Total Cash Compensation & Change in Job Responsibilities/Reporting Structure/Demotion

62.     Ronald Sullivan worked for Kos Pharmaceuticals.  While employed by Kos, the cash compensation which he earned was based in part upon his ability to convince the doctors upon whom he called to prescribe Kos products.  Sullivan worked to establish relationships with doctors and while employed at Kos was able to call upon doctors he knew, with whom he had established relationships, and to whom he was able to consistently sell products.  Sullivan was a consistent high producer of sales.  Following the acquisition of Kos by Abbott, Sullivan's established accounts, territory and product line were stripped from him.  As a result of the realignment of the sales force, he suffered a material reduction in his cash compensation, exceeding 10%.  Moreover, Sullivan had been a cardiovascular sales specialist (CSS) while employed at Kos, a position that is earned by experience within the pharmaceutical industry and strong sales background.  As such he called upon specialty physicians.  He was demoted by Abbott to a lipid sales specialist (LSS), an entry level sales position.  Not only did this decrease his ability to generate commissions, but it was also a significant reduction in his job responsibilities, affecting both his future employment opportunities and his income potential.  As such, Sullivan terminated his employment for these "Good Reasons" and/or other Good Reason as provided by the Plan.

## GARY USSELMANN
### Material Reduction in Total Cash Compensation & Change in Job Responsibilities/Reporting Structure/Demotion

63.     Gary Usselmann worked for Kos Pharmaceuticals.  While employed by Kos, the cash compensation which he earned was based in part upon his ability to convince the doctors upon whom he called to prescribe Kos products.  Usselmann worked to establish relationships

-38-

with doctors and while employed at Kos was able to call upon doctors he knew, with whom he had established relationships, and to whom he was able to consistently sell products. Usselmann was a consistent high producer of sales. Following the acquisition of Kos by Abbott, Usselmann's established accounts, territory and product line were stripped from him. As a result of the realignment of the sales force, he suffered a material reduction in his cash compensation, exceeding 10%. Moreover, Usselmann had been a cardiovascular sales specialist (CSS) while employed at Kos, a position that is earned by experience within the pharmaceutical industry and strong sales background. As such, he called upon specialty physicians. He was demoted by Abbott to a lipid sales specialist (LSS), an entry level sales position. Not only did this decrease his ability to generate commissions, but it was also a significant reduction in his job responsibilities, affecting both his future employment opportunities and his income potential. As such, Usselmann terminated his employment for these "Good Reasons" and/or other Good Reason as provided by the Plan.

### JAMES VANDERMEER
### Change of Territory Exceeding 50 Miles

64.    James Vandermeer worked for Kos Pharmaceuticals. While employed by Kos, the cash compensation which he earned was based in part upon his ability to convince the doctors upon whom he called to prescribe Kos products. Vandermeer worked to establish relationships with doctors and while employed at Kos was able to call upon doctors he knew, with whom he had established relationships, and to whom he was able to consistently sell products. Vandermeer was a consistent high producer of sales. After Kos was purchased by Abbott, Vandermeer was assigned a new territory. The average distances of the doctors that he was required to call upon

-39-

in the new territory exceeded 50 miles from his principal residence.  In fact, it exceeded 100 miles.  As such, Vandermeer terminated his employment for this "Good Reason" and/or other Good Reason as provided by the Plan.

### BENJAMIN WILLIS
### Change in Job Responsibilities/Reporting Structure/Demotion, & Change of Territory Exceeding 50 Miles

65.     Benjamin Willis worked for Kos Pharmaceuticals.  While employed by Kos, the cash compensation which he earned was based in part upon his ability to convince the doctors upon whom he called to prescribe Kos products.  Willis worked to establish relationships with doctors and while employed at Kos was able to call upon doctors he knew, with whom he had established relationships, and to whom he was able to consistently sell products.  Willis was a consistent high producer of sales. Willis had been a cardiovascular sales specialist (CSS) while employed at Kos, a position that is earned by experience within the pharmaceutical industry and strong sales background.  As such, he called upon specialty physicians.  He was demoted by Abbott to a lipid sales specialist (LSS), an entry level sales position.  Not only did this decrease his ability to generate commissions, but it was also a significant reduction in his job responsibilities, affecting both his future employment opportunities and his income potential.  Finally, after Kos was purchased by Abbott, Willis was assigned a new territory.  The average distances of the doctors that he was required to call upon in the new territory exceeded 50 miles from his principal residence.   As such, Willis terminated his employment for these "Good Reasons" and/or other Good Reason as provided by the Plan.

66.     Each Plaintiff had Good Reason to terminate his or her employment with Abbott. The decision of Defendant to deny benefits was contrary to the provisions of the Plan. The

decisions ignored undisputed facts. The decision is not supported by evidence in the record. Among other things, the Plan ignored the actual compensation earned by Plaintiffs during their employment with Kos when determining whether a reduction in compensation had occurred, ignored the plain language of the Plan, considered as income to Plaintiffs amounts of compensation from Abbott which were purely speculative, determined distances from work based upon arbitrary and capricious considerations, ignored the changes in work assignments and the effect changes in work assignment would have on the earning capacity of Plaintiffs.

67.     Each Plaintiff requested from the Plan documents necessary to properly evaluate and investigate their appeal and appeal rights. The Plan failed and refused to provide documents and information required to be provided or necessary to effectively appeal the denial of benefits.

## COUNT 1
## 502(a)(1)(B) CLAIM FOR BENEFITS

68.     Plaintiffs incorporate the contents of the preceding paragraphs of this Complaint as if set forth here in the entirety.

69.     Plaintiffs allege that they were eligible for severance benefits under the Plan and that they were wrongfully denied benefits in violation of Section 502(a)(1)(B) ERISA; 29 U.S.C. §1132(a)(1)(B).

WHEREFORE, Plaintiffs demand judgment against Defendant for damages, actual and compensatory, injunctive relief, attorneys' fees, and such other relief as this Court deems appropriate.

## COUNT II
## CLAIM FOR INJUNCTIVE RELIEF ERISA § 502(a)(3)

70.     Plaintiffs incorporate the contents of the preceding paragraphs of this Complaint as if set forth here in the entirety.

71.     In the alternative, Plaintiffs claim that Defendant violated section 502(a)(3) as Defendant failed to provide Plaintiffs with an adequate claims procedure and/or a full and fair review as required under 29 U.S.C.§1133. Among other things, Defendant rejected, failed to consider, or failed to otherwise appropriately evaluate the evidence submitted on behalf of Plaintiffs. Moreover, Defendant failed to timely provide information relevant to and necessary for Plaintiffs to formulate an effective appeal. A failure to provide an appropriate claims procedure gives rise to a claim under section 502(a)(3) for appropriate equitable relief, including but not limited to, an order enjoining Defendant from future violations of §1133.

WHEREFORE, PREMISES CONSIDERED, Plaintiffs respectfully request that the Court enter an Order (1) enjoining Defendant from future violations of the terms of the Plan, (2) directing Defendant to adopt a claim and review procedure consistent with the provisions of ERISA, (3) directing Defendant to pay Plaintiffs reasonable attorneys' fees plus costs of litigation, and (4) declaring any equitable relief (including injunctive) pursuant to section 502(a)(3) (29 U.S.C. §1132(a)(3)) that the Court deems appropriate to remedy Defendant's acts or practices that violate the terms of the policy and/or any provision of Title I of ERISA.

WHEREFORE, Plaintiffs demand judgment against Defendant, Abbott Severance Pay Plan for Employees of Kos Pharmaceuticals, for actual, compensatory, and punitive damages, injunctive, and declaratory relief, attorneys' fees and costs, and for such other or different relief that a trier of fact may determine or that this Court may deem necessary and appropriate.

## COUNT III

72.     Plaintiffs incorporate the contents of the preceding paragraphs of this Complaint as if set forth here in their entirety.

73.     Defendant failed to provide documents which Defendant was requested to provide pursuant to 29 U.S.C. §1133. Plaintiffs claim statutory damages as provided in 29 U.S.C. §1132 to provide information requested.

WHEREFORE, PREMISES CONSIDERED, Plaintiffs demand judgment against Defendant, Abbott Severance Pay Plan for Employees of Kos Pharmaceuticals, for actual, compensatory, and punitive damages, injunctive and declaratory relief, attorneys' fees and costs, and for such other or different relief that a trier of fact may determine or that this Court may deem necessary and appropriate.

Dated:  December 21, 2011

                                          **LITE DEPALMA GREENBERG, LLC**

                              By:    /s/ Bruce D. Greenberg
                                     Bruce D. Greenberg
                                     bgreenberg@litedepalma.com
                                     Two Gateway Center, 12th Floor
                                     Newark, NJ 07102
                                     Telephone: (973) 623-3000

                                     Glen M. Connor
                                     Quinn, Connor, Weaver,
                                     Davies & Rouco LLP
                                     2700 Highway 280, Suite 380
                                     Birmingham, AL  35223

                                     Joe R. Whatley Jr.
                                     Whatley Drake & Kallas, LLC
                                     1540 Broadway, 37th Floor
                                     New York, New York  10036

                                     Christopher A. Keith
                                     Wettermark, Holland & Keith, LLC
                                     2101 Highland Avenue South, Suite 750
                                     Birmingham, AL 35205
                                     (205) 933-9500

## CERTIFICATION PURSUANT TO LOCAL CIVIL RULE 11.2

Plaintiffs, by their attorneys, hereby certify that the matter in controversy is also the subject of the following action, *Veltri, et al v. Abbott Severance Pay Plan for Employees of Kos Pharmaceuticals,* 2:-8cv-00915-PGS-ES**.** That case involved the same defendant, the same Plan, and the same legal issues. Judge Sheridan denied cross-motions for summary judgment in that case and remanded to the Plan Administrator for consideration consistent with his opinion on those cross-motions (see Doc. No. 57 and 58). Neither Judge Sheridan's opinion (Doc. No. 57) nor his Order (Doc. No. 58) closed that case. It remains pending. The Plan Administrator took an action on the remand, and Plaintiffs in that case will return to Judge Sheridan on the same issues presented in the present Complaint.

I hereby certify that the following statements made by me are true. I am aware that if any of the foregoing statements made by me are willfully false, I am subject to punishment.

Dated: December 21, 2011

**LITE DEPALMA GREENBERG, LLC**

By:   /s/ Bruce D. Greenberg
Bruce D. Greenberg
bgreenberg@litedepalma.com
Two Gateway Center, 12th Floor
Newark, NJ 07102
Telephone: (973) 623-3000

# EXHIBIT A

AS ADOPTED ON NOVEMBER 5, 2006

## KOS PHARMACEUTICALS
## CHANGE IN CONTROL SEVERANCE PLAN

The Board of Directors (the "Board") of Kos Pharmaceuticals, Inc. (the "Company") recognizes the importance to the best interests of the Company and its shareholders of ensuring that the Company and its subsidiaries have the continued dedication and leadership of the Company's employees, notwithstanding the possibility, threat or occurrence of a Change in Control (as defined below). The Board recognizes that the possibility of a Change in Control and the uncertainty it may create among employees may result in the departure or distraction of Company personnel to the detriment of the Company and its shareholders. Therefore, the Board has decided to ratify the Compensation and Stock Option Committee's approved this Change in Control Severance Plan (this "Plan") in order to encourage the retention of employees and to reduce the level of uncertainty and distraction that is likely to result from a Change in Control or a potential Change in Control.

SECTION 1. Definitions. For purposes of this Plan, the following terms shall have the meanings set forth below:

(a) "280G Gross-Up Payment" shall have the meaning set forth in Section 5(a).

(b) "Accounting Firm" shall have the meaning set forth in Section 5(b).

(c) "Accrued Rights" shall have the meaning set forth in Section 4(a)(iv).

(d) "Affiliate(s)" means, with respect to any specified Person, any other Person that, directly or indirectly, through one or more intermediaries, controls, is controlled by, or is under common control with, such specified Person.

(e) "Annual Base Salary" means, with respect to any Participant, such Participant's annual rate of base salary in effect immediately prior to such Participant's Termination Date.

(f) "Annual Bonus" means, with respect to any Participant and as of such Participant's Termination Date, 110% of the average of the regular annual cash bonuses (or, in the case of sales personnel, annual commissions), excluding special or one-time bonuses or commissions, actually paid to the Participant in each of the two full years prior to the year in which such Participant's Termination Date occurs; provided that if such Participant has not been employed for a sufficient length of time to have been eligible for two such bonuses or commissions (whether or not any bonus or commission was actually paid), "Annual Bonus" shall be calculated on the basis of the average of the regular annual cash bonuses or commissions (excluding special or one-time bonuses or commissions) actually paid to other employees of similar position in each of the two full years prior to the year in which the Participant's Termination Date occurs.

2

(g) "Cause" means, with respect to any Participant, the occurrence of any one of the following:

(i) the Participant is convicted of, or pleads guilty or nolo contendere to, (A) a misdemeanor involving moral turpitude or that involves misappropriation of the assets of the Company or a Subsidiary or (B) a felony;

(ii) the Participant commits one or more acts or omissions constituting negligence, fraud or other misconduct that the Company reasonably and in good faith determines has a materially detrimental effect on the Company;

(iii) the Participant continually and willfully fails, for at least 14 days following written notice from the Company, to perform substantially the Participant's employment (other than as a result of incapacity due to physical or mental illness or after delivery by the Participant of a Notice of Termination for Good Reason); or

(iv) the Participant commits a material violation of any of the Company's material policies (including the Company's Code of Business Conduct and Ethics, as in effect from time to time) that the Company reasonably and in good faith determines is materially detrimental to the best interests of the Company.

(h) "Change in Control" means any corporation or other entity or group (within the meaning of Section 13(d)(3) or 14(d)(2) of the Exchange Act) other than the Controlling Shareholders becomes the beneficial owner, directly or indirectly, of all of the outstanding shares of common stock of the Company.

(i) "Change in Control Date" means the date on which a Change in Control occurs (if any).

(j) "Code" means the Internal Revenue Code of 1986, as amended from time to time, and the regulations promulgated thereunder.

(k) "Controlling Shareholders" means, collectively, the group of shareholders set forth in the Schedule 13D filed with the Securities and Exchange Commission on September 12, 2006, consisting of Michael Jaharis, Mary Jaharis, Wilson Point Holdings, LP, Cubs Management, LLC, Kos Investments, Inc., Kos Holdings, Inc., Kathryn Jaharis, Steven Jaharis and Jaharis Holdings, Inc, LLC.

(l) "Disability" means, with respect to any Participant, that the Participant becomes eligible to receive income replacement benefits under any long term disability plan covering employees of the Company or its Subsidiaries.

(m) "Effective Date" shall have the meaning set forth in Section 13.

(n) "Exchange Act" means the Securities Exchange Act of 1934, as amended from time to time, or any successor statute thereto.

3

(o) "Excise Tax" means the excise tax imposed by Section 4999 of the Code, together with any interest or penalties imposed with respect to such tax.

(p) "Extension Date" shall have the meaning set forth in Section 13.

(q) "Good Reason" means, with respect to any Participant and without such Participant's express written consent, the occurrence of any one or more of the following:

(i) a greater than 10% reduction of the Participant's annual base salary, or any material reduction in the total cash compensation that the Participant is eligible to earn, from the level in effect immediately prior to the Change in Control Date;

(ii) any demotion or other significant reduction in the job responsibilities held by the Participant immediately prior to the Change in Control Date or any significant change to the reporting relationships of the Participant as in effect immediately prior to the Change in Control Date; or

(iii) any change of the Participant's principal place of employment to a location more than (i) in the case of Participants who are not sales personnel, 65 miles from the Participant's principal place of employment immediately prior to the Change in Control Date and (ii) in the case of Participants who are sales personnel, 50 miles from the Participant's principal residence immediately prior to the Change in Control Date.

The Participant's right to terminate employment for Good Reason shall not be affected by the Participant's incapacity due to physical or mental illness. A termination of employment by the Participant for Good Reason for purposes of this Plan shall be effectuated by giving the Company written notice ("Notice of Termination for Good Reason") of the termination setting forth in reasonable detail the specific conduct of the Company that constitutes Good Reason and the specific provisions of this Plan on which the Participant relied. Unless the parties agree otherwise, a termination of employment by the Participant for Good Reason shall be effective on the 30th day following the date when the Notice of Termination for Good Reason is given, unless the Company elects to treat such termination as effective as of an earlier date; provided, however, that so long as an event that constitutes Good Reason occurs during the Protection Period, for purposes of the payments, benefits and other entitlements set forth in Section 4(a), the termination of the Participant's employment pursuant thereto shall be deemed to be a resignation for Good Reason during the Protection Period.

(r) "Notice of Termination for Good Reason" shall have the meaning set forth in Section 1(q).

(s) "Participant" shall have the meaning set forth in Section 2.

(t) "Payment" means any payment, benefit or distribution (or combination thereof) by the Company, any of its Affiliates or any trust established by the Company or its Affiliates, to or for the benefit of a Participant, whether paid, payable, distributed,

4

distributable or provided pursuant to this Plan or otherwise, including any payment, benefit or other right that constitutes a "parachute payment" within the meaning of Section 280G of the Code.

(u) "Person" means a "person" (as such term is used in Section 13(d) of the Exchange Act.

(v) "Protection Period" means the period commencing on the Change in Control Date and ending on the first anniversary thereof.

(w) "Release Effective Date" shall have the meaning set forth in Section 4(a)(i).

(x) "Section 409A Tax" shall have the meaning set forth in Section 6.

(y) "Severance Multiple" means, with respect to any Participant, the number indicated on the chart set forth on Schedule A hereto based on such Participant's Years of Service and job classification; provided, however, that the Severance Multiple of (i) Participants who are classified as directors, managers or professionals shall not be less than 52, (ii) Participants who are classified sales personnel shall not be less than 39, and (iii) all other Participants shall not be less than 26.

(z) "Subsidiary" means any entity in which the Company, directly or indirectly, possesses 50% or more of the total combined voting power of all classes of its stock.

(aa) "Successor" shall have the meaning set forth in Section 10.

(bb) "Termination Date" means the date on which the termination of a Participant's employment, in accordance with the terms of this Plan, is effective.

(cc) "Underpayment" shall have the meaning set forth in Section 5(b).

(dd) "Years of Service" means, with respect to any Participant, the number of full years that such Participant has been an employee of the Company or its Subsidiaries as of such Participant's Termination Date. For purposes hereof, "year" means any period of 12 consecutive calendar months, without regard to any short-term leave, parental leave or other approved absence.

SECTION 2.  Eligibility.  Participants in this Plan ("Participants") are those individuals who are classified as employees of the Company and its Subsidiaries who are employed by the Company or its Subsidiaries on or following the Effective Date, other than any such employee who enters into an individual change in control severance agreement with the Company; provided, however, that in the case of any such employee who is or becomes a Participant prior to the Change in Control Date but who is not employed by the Company or its Subsidiaries immediately prior to the Change in Control Date, such employee shall not be treated as a Participant for purposes of this Plan.

SECTION 3.  Impact of a Change in Control on Equity Compensation Awards.  Effective as of any Change in Control Date during the period of this Plan's effectiveness, notwithstanding any provision to the contrary in any of the Company's equity-based, equity-related or other long-term incentive compensation plans, practices, policies and programs (including the Company's 1996 Stock Option Plan and 2006 Incentive Plan) or any award agreements thereunder, (a) all outstanding stock options, stock appreciation rights, restricted shares and similar rights and awards then held by each Participant that are unexercisable or otherwise unvested shall automatically become fully vested and immediately exercisable, as the case may be, (b) all outstanding equity-based, equity-related and other long-term incentive awards then held by such Participant that are subject to performance-based vesting criteria shall automatically become fully vested and earned at a deemed performance level equal to the maximum performance level with respect to such awards and (c) all other outstanding equity-based, equity-related and long-term incentive awards, to the extent not covered by the foregoing clause (a) or (b), then held by such Participant that are unvested or subject to restrictions or forfeiture shall automatically become fully vested and all restrictions and forfeiture provisions related thereto shall lapse.

SECTION 4.  Termination of Employment.  (a)  Termination During the Protection Period by the Company Without Cause or by the Participant for Good Reason. Subject to Section 4(a)(v), if a Participant's employment is terminated either (x) by the Company or its Subsidiaries other than for Cause, death or Disability or (y) by resignation of the Participant with Good Reason, in each case during the Protection Period, then the Participant shall be entitled to the following payments and benefits:

(i) Severance Pay.  The Company shall pay the Participant an amount equal to the sum of (A) a number of weeks of the Participant's Annual Base Salary (without regard to any reduction giving rise to Good Reason) equal to the Severance Multiple and (B) the Participant's Annual Bonus multiplied by a fraction the numerator of which is the Severance Multiple and the denominator of which is 52, which sum shall be payable in a lump-sum payment on the tenth business day after the date the release described in Section 4(a)(v) becomes effective and irrevocable (the "Release Effective Date"); provided, however, that such amount shall be paid in lieu of, and the Participant hereby waives the right to receive, any other cash severance payment relating to salary or bonus continuation the Participant is otherwise eligible to receive upon termination of employment under any severance plan, practice, policy or program of the Company or any Subsidiary.

(ii) Prorated Annual Bonus.  The Company shall pay the Participant an amount equal to the product of (A) the Participant's target annual bonus for the year in which the Termination Date occurs (assuming all individual and business criteria are met at target levels) and (B) a fraction, the numerator of which is the number of days in the current fiscal year through such Termination Date, and the denominator of which is 365, in a lump-sum payment on the tenth business day after the Release Effective Date.

(iii) Continued Welfare Benefits.  The Company shall continue to provide for a number of weeks equal to the Severance Multiple medical and welfare benefits to the

Participant and the Participant's spouse and dependents (in each case, as provided in the applicable plan) at least equal to the levels of benefits provided by the Company and its Subsidiaries immediately prior to the Change in Control Date. Nothing in this Section 4(a)(iii) shall operate to reduce, or be construed as reducing, the Participant's group health plan continuation rights under the Consolidated Omnibus Budget Reconciliation Act of 1985, as amended, in any manner.

(iv) Accrued Rights. The Participant shall be entitled to (A) payments of any unpaid annual base salary, annual bonus, commissions or other amounts earned or accrued through the Participant's Termination Date and (B) except as provided in Section 4(a)(i), any payments or benefits explicitly set forth in any other agreements, benefit plans, practices, policies, arrangements and programs to which the Participant is a party or in which the Participant participates (the rights to such payments, the "Accrued Rights").

(v) Release of Claims. Notwithstanding any provision of this Plan to the contrary, the Company shall not be obligated to make any payments or provide any benefits described in this Section 4(a), other than payments or benefits in respect of the Accrued Rights, unless and until such time as the Participant has executed and delivered a Separation Agreement and Release substantially in the form of Exhibit A hereto and such release has become effective and irrevocable in accordance with its terms.

(b) Other Termination. If a Participant's employment is terminated in any circumstance not described in Section 4(a) (including as a result of death or Disability), the Participant shall not be entitled to any compensation or benefits described in Section 4(a) other than any payments with respect to the Accrued Rights.

SECTION 5. Certain Additional Payments by the Company.
(a) Notwithstanding anything in this Plan to the contrary and except as set forth below, in the event it shall be determined that any Payment that is paid or payable to or for the benefit of a Participant during the period of this Plan's effectiveness would be subject to the Excise Tax, such Participant shall be entitled to receive an additional payment (a "280G Gross-Up Payment") in an amount such that, after payment by such Participant of all taxes (and any interest or penalties imposed with respect to such taxes), including any income and employment taxes (and any interest and penalties imposed with respect thereto) and Excise Taxes imposed upon the 280G Gross-Up Payment, such Participant retains an amount of the 280G Gross-Up Payment equal to the Excise Tax imposed upon such Payments. The Company's obligation to make 280G Gross-Up Payments under this Section 5 shall not be conditioned upon a Participant's termination of employment and shall survive and apply after such Participant's termination of employment. At the time of any Payment during the period of this Plan's effectiveness, the Company shall provide each Participant a written description of the application of the Excise Tax (if any) to such Payment.

(b) Subject to the provisions of Section 5(c), all determinations required to be made under this Section 5, including whether and when a 280G Gross-Up Payment is required, the amount of such 280G Gross-Up Payment and the assumptions to be utilized

in arriving at such determination, shall be made in accordance with the terms of this Section 5 by a nationally recognized certified public accounting firm that shall be designated by the Company (other than the Company's regular auditor) (the "Accounting Firm"). The Accounting Firm shall provide detailed supporting calculations both to the Company and the applicable Participant within 15 business days of the receipt of notice from the Participant that there has been a Payment or such earlier time as is requested by the Company. For purposes of determining the amount of any 280G Gross-Up Payment, each Participant shall be deemed to pay Federal income tax at the highest marginal rate applicable to individuals in the calendar year in which any such 280G Gross-Up Payment is to be made and deemed to pay state and local income taxes at the highest marginal rates applicable to individuals in the state or locality of the Participant's residence or place of employment in the calendar year in which any such 280G Gross-Up Payment is to be made, net of the maximum reduction in Federal income taxes that can be obtained from deduction of state and local taxes, taking into account limitations applicable to individuals subject to Federal income tax at the highest marginal rate. All fees and expenses of the Accounting Firm shall be borne solely by the Company. Any 280G Gross-Up Payment, as determined pursuant to this Section 5, shall be paid by the Company to the applicable Participant within 5 business days of the receipt of the Accounting Firm's determination. If the Accounting Firm determines that no Excise Tax is payable by such Participant, it shall so indicate to such Participant in writing. Any determination by the Accounting Firm shall be binding upon the Company and the applicable Participant. As a result of the uncertainty in the application of the Excise Tax, at the time of the initial determination by the Accounting Firm hereunder, it is possible that the amount of the 280G Gross-Up Payment determined by the Accounting Firm to be due to a Participant, consistent with the calculations required to be made hereunder, will be lower than the amount actually due, including any interest and penalties (an "Underpayment"). In the event the Company exhausts its remedies pursuant to Section 5(c) and such Participant thereafter is required to make a payment of any Excise Tax, the Accounting Firm shall determine the amount of the Underpayment that has occurred and any such Underpayment shall be paid by the Company to such Participant within 5 business days of the receipt of the Accounting Firm's determination.

(c) Each Participant shall notify the Company in writing of any written claim by the Internal Revenue Service that, if successful, would require the payment by the Company of a 280G Gross-Up Payment. Such notification shall be given as soon as practicable, but no later than 10 business days after the Participant is informed in writing of such claim. Failure to give timely notice shall not prejudice any Participant's right to 280G Gross-Up Payments and rights of indemnity under this Section 5, unless, and solely to the extent that, the Company has been prejudiced in a material respect by such failure. Each Participant shall apprise the Company of the nature of such claim and the date on which such claim is requested to be paid. No Participant shall pay such claim prior to the expiration of the 30-day period following the date on which the Participant gives such notice to the Company (or such shorter period ending on the date that any payment of taxes with respect to such claim is due). If the Company notifies a Participant in writing prior to the expiration of such period that the Company desires to contest such claim, the Participant shall (i) give the Company any information reasonably requested by the Company relating to such claim, (ii) take such action in connection with contesting such

8

claim as the Company shall reasonably request in writing from time to time, including accepting legal representation with respect to such claim by an attorney reasonably selected by the Company, (iii) cooperate with the Company in good faith in order effectively to contest such claim and (iv) permit the Company to participate in any proceedings relating to such claim; provided, however, that the Company shall bear and pay directly all costs and expenses (including additional income taxes, interest and penalties) incurred in connection with such contest, and shall indemnify and hold the Participant harmless, on an after-tax basis, for any Excise Tax or income tax (including interest or penalties) imposed as a result of such representation and payment of costs and expenses. Without limitation on the foregoing provisions of this Section 5(c), the Company shall control all proceedings taken in connection with such contest, and, at its sole discretion, may pursue or forgo any and all administrative appeals, proceedings, hearings and conferences with the applicable taxing authority in respect of such claim and may, at its sole discretion, either direct the Participant to pay the tax claimed and sue for a refund or contest the claim in any permissible manner, and the Participant agrees to prosecute such contest to a determination before any administrative tribunal, in a court of initial jurisdiction and in one or more appellate courts, as the Company shall determine; provided, however, that (A) if the Company directs the Participant to pay such claim and sue for a refund, the Company shall advance the amount of such payment to the Participant, on an interest-free basis, and shall indemnify and hold the Participant harmless, on an after-tax basis, from any Excise Tax or income tax (including interest or penalties) imposed with respect to such advance or with respect to any imputed income in connection with such advance and (B) if such contest results in any extension of the statute of limitations relating to payment of taxes for the taxable year of the Participant with respect to which such contested amount is claimed to be due, such extension must be limited solely to such contested amount. Furthermore, the Company's control of the contest shall be limited to issues with respect to which the 280G Gross-Up Payment would be payable hereunder, and each Participant shall be entitled to settle or contest, as the case may be, any other issue raised by the Internal Revenue Service or any other taxing authority.

(d) If, after the receipt by a Participant of an amount advanced by the Company pursuant to Section 5(c), the Participant becomes entitled to receive any refund with respect to such claim, the Participant shall (subject to the Company's complying with the requirements of Section 5(c)) promptly pay to the Company the amount of such refund received (together with any interest paid or credited thereon after taxes applicable thereto). If, after the receipt by a Participant of an amount advanced by the Company pursuant to Section 5(c), a determination is made that the Participant shall not be entitled to any refund with respect to such claim and the Company does not notify the Participant in writing of its intent to contest such denial of refund prior to the expiration of the 30-day period after such determination, then such advance shall be forgiven and shall not be required to be repaid and the amount of such advance shall offset, to the extent thereof, the amount of 280G Gross-Up Payment required to be paid.

SECTION 6.  Section 409A.  It is the intention of the Company that the provisions of this Plan comply with Section 409A of the Code, and all provisions of this Plan shall be construed and interpreted in a manner consistent with Section 409A of the

9

Code. To the extent necessary to avoid imposition of any additional tax or interest penalties under Section 409A (such tax and interest penalties, a "Section 409A Tax"), notwithstanding the timing of payment provided in any other Section of this Plan, the timing of any payment, distribution or benefit pursuant to this Plan shall be subject to a six-month delay in a manner consistent with Section 409A(a)(2)(B)(i) of the Code; provided that if a Participant dies during such six-month period, any such delayed payments shall not be further delayed, and shall be immediately payable to the Participant's devisee, legatee or other designee or, should there be no such designee, to the Participant's estate in accordance with the applicable provisions of this Plan. From and after the Effective Date, (i) the Company shall administer and operate this Plan in compliance with Section 409A of the Code and any rules, regulations or other guidance promulgated thereunder as in effect from time to time and (ii) in the event that the Company determines that any provision of this Plan does not comply with Section 409A of the Code or any such rules, regulations or guidance and that as a result any Participant may become subject to a Section 409A Tax, the Company shall amend or modify such provision to avoid the application of such Section 409A Tax, provided that such amendment or modification shall not reduce the economic value to the Participants of such provision.

SECTION 7. No Mitigation or Offset; Enforcement of this Plan. (a) The Company's obligation to make the payments provided for in this Plan and otherwise to perform its obligations hereunder shall not be affected by any set-off, counterclaim, recoupment, defense or other claim, right or action which the Company may have against any Participant or others. In no event shall any Participant be obligated to seek other employment or take any other action by way of mitigation of the amounts payable to the Participant under any of the provisions of this Plan and, except as otherwise expressly provided for in this Plan, such amounts shall not be reduced whether or not the Participant obtains other employment.

(b) In the event that any Participant is the prevailing party in any contest, dispute or proceeding regarding the Participant's rights pursuant to this Plan, the Company shall reimburse, upon the Participant's written demand, any and all reasonable legal fees and expenses that the Participant may incur as a result of such contest, dispute or proceeding (including as a result of any contest regarding the amount of any payment owed pursuant to this Plan), and shall indemnify and hold the Participant harmless, on an after-tax basis, for any tax (including Excise Tax) imposed on the Participant as a result of payment by the Company of such legal fees and expenses.

SECTION 8. Non-Exclusivity of Rights. Except as specifically provided in Sections 2 and 4(a)(i), nothing in this Plan shall prevent or limit a Participant's continuing or future participation in any plan, practice, policy or program provided by the Company or a Subsidiary for which the Participant may qualify, nor shall anything in this Plan or the accompanying Separation Agreement and Release limit or otherwise affect any rights the Participant may have under any contract or agreement with the Company or a Subsidiary. Vested benefits and other amounts a Participant is otherwise entitled to receive under any incentive compensation (including any equity award agreement), deferred compensation, retirement, pension or other plan, practice, policy or program of,

[[NYCORP:2654388v3:3800C:11/05/06--01:35 p]]

or any contract or agreement with, the Company or a Subsidiary shall be payable in accordance with the terms of each such plan, practice, policy, program, contract or agreement, as the case may be, except as explicitly modified by this Plan.

SECTION 9.  Withholding.  The Company may deduct and withhold from any amounts payable under this Plan such Federal, state, local, foreign or other taxes as are required to be withheld pursuant to any applicable law or regulation.

SECTION 10.  Successors.  This Plan shall bind any successor (a "Successor") to all or substantially all of the business or assets of the Company (whether direct or indirect, by purchase, merger, consolidation or otherwise), in the same manner and to the same extent that the Company would have been obligated under this Plan if no such succession had taken place.  In the case of any transaction in which a Successor would not, pursuant to the foregoing provision or by operation of law, be bound by this Plan, the Company shall require such Successor expressly and unconditionally to assume and agree to perform the Company's obligations under this Plan, in the same manner and to the same extent that the Company would have been required to perform such obligations if no such succession had taken place.  The term "Company", as used in this Plan, shall mean the Company as hereinbefore defined and any Successor and any assignee to such business or assets which by reason hereof becomes bound by this Plan.

SECTION 11.  Default in Payment.  Any payment not made within ten business days after it is due in accordance with this Plan shall thereafter bear interest, compounded annually, at the prime rate in effect from time to time at Citibank, N.A., or any successor thereto.

SECTION 12.  **GOVERNING LAW.  THIS PLAN SHALL BE DEEMED TO BE MADE IN THE STATE OF NEW JERSEY, AND THE VALIDITY, INTERPRETATION, CONSTRUCTION AND PERFORMANCE OF THIS PLAN IN ALL RESPECTS SHALL BE GOVERNED BY THE LAWS OF THE STATE OF NEW JERSEY WITHOUT REGARD TO ITS PRINCIPLES OF CONFLICTS OF LAW.**

SECTION 13.  Duration; Termination.  This Plan shall become effective upon the date of its adoption by the Board (the "Effective Date"), and shall remain in effect until the second anniversary thereof.  Notwithstanding the foregoing, in the event of a Change in Control during the period of this Plan's effectiveness, this Plan shall continue in full force and effect in accordance with its terms and shall not terminate or expire until all the Company's obligations to all Participants have been satisfied in full; provided, however, that this Plan shall only be effective with respect to the first Change in Control that occurs following the Effective Date and the Participants shall not be entitled to any payments or benefits pursuant to this Plan with respect to any subsequent Change in Control.

SECTION 14.  Amendment or Modification.  The Board may amend or modify this Plan at any time; provided, however, that except as specifically required by Section 6, on and after the Change in Control Date, this Plan may not be amended at any

11

time in a manner that is adverse to a Participant without the prior written consent of such Participant. The failure of a Participant to insist upon strict adherence to any term of this Plan on any occasion shall not be considered a waiver of such Participant's rights or deprive such Participant of the right thereafter to insist upon strict adherence to that term or any other term of this Plan. No failure or delay by any Participant in exercising any right or power hereunder will operate as a waiver thereof, nor will any single or partial exercise of any such right or power, or any abandonment of any steps to enforce such right or power, preclude any other or further exercise thereof or the exercise of any other right or power.

      SECTION 15. <u>Severability.</u> If any term or provision of this Plan is invalid, illegal or incapable of being enforced by any applicable law or public policy, all other conditions and provisions of this Plan shall nonetheless remain in full force and effect.

      SECTION 16. <u>Survival.</u> The provisions of this Plan, including Sections 4, 5, 6, 7, 10 and 11, shall survive and remain binding and enforceable, notwithstanding the expiration or termination of this Plan, the termination of a Participant's employment with the Company for any reason or any settlement of the financial rights and obligations arising from such Participant's participation hereunder, to the extent necessary to preserve the intended benefits of such provisions.

      SECTION 17. <u>Notices.</u> All notices or other communications required or permitted by this Plan will be made in writing and all such notices or communications will be deemed to have been duly given when delivered or (unless otherwise specified) mailed by United States certified or registered mail, return receipt requested, postage prepaid, addressed as follows:

      (a) If to the Company:    Kos Pharmaceuticals, Inc.
                                    1 Cedar Brook Drive
                                    Cranbury, NJ 08512-3618

                                    Attention:   Executive Vice President, General Counsel
                                                        and Corporate Secretary

                                    Fax: 609-497-0907

      (b) If to a Participant, to such Participant's address as most recently supplied to the Company and set forth in the Company's records;

or to such other address as any party may have furnished to the other in writing in accordance herewith, except that notices of change of address shall be effective only upon receipt.

      SECTION 18. <u>Headings and References.</u> The headings of this Plan are inserted for convenience only and neither constitute a part of this Plan nor affect in any

12

way the meaning or interpretation of this Plan.  When a reference in this Plan is made to a
Section, such reference shall be to a Section of this Plan unless otherwise indicated.

SECTION 19.  <u>Interpretation.</u>  For purposes of this Plan, the words
"include" and "including", and variations thereof, shall not be deemed to be terms of
limitation but rather shall be deemed to be followed by the words "without limitation".
The term "or" is not exclusive.  The word "extent" in the phrase "to the extent" shall
mean the degree to which a subject or other thing extends, and such phrase shall not
mean simply "if".

Adopted by the Board of Directors of Kos
Pharmaceuticals, Inc., as of November 5,
2006.

[[NYCORP:2654388v3:3800C:11/05/06–01:35 p]]

SCHEDULE A

| SEVERANCE MULTIPLE | | | |
|---|---|---|---|
| Years of Service | Directors, Managers and Professionals | Sales Personnel | Others |
| Less than 1 | 6 | 3 | 3 |
| 1 Year but less than 2 | 9 | 4.5 | 3 |
| 2 Years but less than 3 | 12 | 6 | 6 |
| 3 Years but less than 4 | 18 | 9 | 9 |
| 4 Years but less than 5 | 24 | 12 | 12 |
| 5 Years but less than 6 | 30 | 15 | 15 |
| 6 Years but less than 7 | 36 | 21 | 18 |
| 7 Years but less than 8 | 42 | 27 | 21 |
| 8 Years but less than 10 | 48 | 33 | 24 |
| 10 Years but less than 15 | 54 | 39 | 27 |
| 15 or more Years | 60 | 45 | 33 |

EXHIBIT A

## SEPARATION AGREEMENT AND RELEASE

I.  <u>Release.</u> For good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the undersigned, with the intention of binding himself/herself, his/her heirs, executors, administrators and assigns, does hereby release and forever discharge Kos Pharmaceuticals, Inc., a Florida corporation , [to be amended, if necessary, to add or identify any additional or other entity that may be the Executive's employer at the time of the Qualifying Termination set forth in Section 4 of that certain Change in Control Severance Agreement between the Executive and Company] (the "Company"), and its or their parents, subsidiaries, affiliates, predecessors, successors, and/or assigns, past, present, and future, together with its and their officers, directors, executives, agents, employees, and employee benefits plans (and the trustees, administrators, fiduciaries and insurers of such plans), past, present, and future (collectively, the "Released Parties"), from any and all claims, actions, causes of action, demands, rights, damages, debts, accounts, suits, expenses, attorneys' fees and liabilities of whatever kind or nature in law, equity, or otherwise, whether now known or unknown (collectively, the "<u>Claims</u>"), which the undersigned now has, owns or holds, or has at any time heretofore had, owned or held against any Released Party, from the beginning of time to the date of the Executive's execution of this Separation Agreement and Release, including without limitation, any Claims arising out of or in any way connected with the undersigned's employment relationship with the Company, its subsidiaries, predecessors or affiliated entities, or the termination thereof, under any Federal, state or local statute, rule, or regulation, or principle of common, tort or contract law, including but not limited to, the Family and Medical Leave Act of 1993, <u>as amended</u> (the "<u>FMLA</u>"), 29 U.S.C. §§ 2601 <u>et seq.</u>, Title VII of the Civil Rights Act of 1964, <u>as amended</u>, 42 U.S.C. §§ 2000e <u>et seq.</u>, the Age Discrimination in Employment Act of 1967, <u>as amended</u>, 29 U.S.C. §§ 621 <u>et seq.</u>, the Americans with Disabilities Act of 1990, <u>as amended</u>, 42 U.S.C. §§ 12101 <u>et seq.</u>, the Worker Adjustment and Retraining Notification Act of 1988, <u>as amended</u>, 29 U.S.C. §§ 2101 <u>et seq.</u>, the Employee Retirement Income Security Act of 1974, <u>as amended</u>, 29 U.S.C. §§ 1001 <u>et seq.</u>, and all other Federal, state, or local statutes, regulations or laws (including but not limited to the New Jersey Conscientious Employee Protection Act, if applicable); <u>provided</u>, <u>however</u>, that nothing herein shall release the Company of its obligations under that certain Change in Control Severance Plan of the Company (including the Accrued Rights (as defined therein)). Except as set forth in Section II below, the undersigned understands that, as a result of executing this Separation Agreement and Release, he/she will not have the right to assert that the Company or any other Released Party unlawfully terminated his/her employment or violated any of his/her rights in connection with his/her employment or otherwise.

  The undersigned affirms that he/she is not presently party to any Claim, complaint or action against any Released Party in any forum or form and that he/she knows of no facts which may lead to any Claim, complaint or action being filed against any Released Party in any forum by the undersigned or by any agency, group, etc. The undersigned further affirms that he/she has been paid and/or has received all leave (paid

2

or unpaid), compensation, wages, bonuses, commissions, and/or benefits to which he/she may be entitled and that no other leave (paid or unpaid), compensation, wages, bonuses, commissions and/or benefits are due to him/her from the Company and its subsidiaries, except as specifically provided in this Separation Agreement and Release. The undersigned furthermore affirms that he/she has no known workplace injuries or occupational diseases and has been provided and/or has not been denied any leave requested under the FMLA. If any agency or court assumes jurisdiction of any such Claim, complaint or action against any Released Party on behalf of the undersigned, the undersigned hereby waives any right to individual monetary or other relief.

The undersigned further declares and represents that he/she has carefully read and fully understands the terms of this Separation Agreement and Release and that, through this document, he/she is hereby advised to consult with an attorney prior to executing this Separation Agreement and Release, that he/she may take up to and including 21 days from receipt of this Separation Agreement and Release, to consider whether to sign this Separation Agreement and Release, that he/she may revoke this Separation Agreement and Release within seven calendar days after signing it by delivering to the Company written notification of revocation (and that this Separation Agreement and Release shall not become effective or enforceable until the expiration of such revocation period), and that he/she knowingly and voluntarily, of his/her own free will, without any duress, being fully informed and after due deliberate action, accepts the terms of and signs the same as his own free act.

II.     Protected Rights.  The Company and the undersigned agree that nothing in this Separation Agreement and Release is intended to or shall be construed to affect, limit or otherwise interfere with any non-waivable right of the undersigned under any Federal, state or local law, including the right to file a charge or participate in an investigation or proceeding conducted by the Equal Employment Opportunity Commission ("EEOC") or to exercise any other right that cannot be waived under applicable law.  The undersigned is releasing, however, his/her right to any monetary recovery or relief should the EEOC or any other agency pursue Claims on his/her behalf. Further, should the EEOC or any other agency obtain monetary relief on his/her behalf, the undersigned assigns to the Company all rights to such relief.

III.     Third-Party Litigation.  The undersigned agrees to be available to the Company and its affiliates on a reasonable basis in connection with any pending or threatened claims, charges or litigation in which the Company or any of its affiliates is now or may become involved, or any other claims or demands made against or upon the Company or any of its affiliates, regardless of whether or not the undersigned is a named defendant in any particular case.

IV.     Return of Property.  The undersigned shall return to the Company on or before [10 DAYS AFTER TERMINATION DATE], all property of the Company in the undersigned's possession or subject to the undersigned's control, including without limitation any laptop computers, keys, credit cards, cellular telephones and files.  The undersigned shall not alter any of the Company's records or computer files in any way after [TERMINATION DATE].

[[NYCORP:2654388v3:3800C:11/05/06--01:35 p]]

3

V.    Confidential Information.  The undersigned acknowledges that Confidential Information (as defined below) is a valuable asset of the Company and that unauthorized disclosure or utilization thereof could be detrimental to the Company. The undersigned, therefore, shall not, after the term of employment with the Company, disclose in any way or to any extent, to any person or organization other than the Company, or utilize for the benefit or profit of the undersigned or any other person or organization other than the Company, any Confidential Information, except (a) as may be authorized in writing in advance by the Company; (b) is publicly available or becomes publicly available other than through a breach of this document by the undersigned or, based on the undersigned's knowledge, the breach of this document by others; and (c) upon prior notification to the Company, the undersigned may be required by law to disclose. "Confidential Information" means information disclosed — whether orally or in writing — to the undersigned, or otherwise known to the undersigned as a direct or indirect result of his or her employment by the Company, concerning (i) the Company's products, patent applications, research activities, formulations, processes, protocols, procedures, other intellectual properties, machines, services, and all matters having to do with the business or operations of the Company, including, but not limited to, all information of any type related to research, product development, manufacturing, quality matters, purchasing, finance, data processing, engineering, facilities, marketing, merchandising and selling, personnel, organization matters, policy matters, legal and other corporate affairs and (ii) information of any type about any third party with which the Company is in technical or commercial cooperation, acquired by the undersigned, directly or indirectly, in connection with his or her employment by the Company. Included in the foregoing definition by way of illustration, but not limitation, are such items as research projects, findings or reports, business plans and projections, formulae, processes, methods of manufacture, computer programs, sales, costs, pricing data, regulatory matters, operating procedures, information about employees and personnel practices, and lists of investigators, consultants, suppliers and customers.  The undersigned agrees not to remove any Confidential Information from the Company, not to request that others do so on the undersigned's behalf and to return any Confidential Information currently in the undersigned's possession to the Company.

VI.    Severability.  If any term or provision of this Separation Agreement and Release is invalid, illegal or incapable of being enforced by any applicable law or public policy, all other conditions and provisions of this Separation Agreement and Release shall nonetheless remain in full force and effect so long as the economic and legal substance of the transactions contemplated by this Separation Agreement and Release is not affected in any manner materially adverse to any party.

VII.    GOVERNING LAW.  THIS SEPARATION AGREEMENT AND RELEASE SHALL BE DEEMED TO BE MADE IN THE STATE OF NEW JERSEY, AND THE VALIDITY, INTERPRETATION, CONSTRUCTION AND PERFORMANCE OF THIS AGREEMENT IN ALL RESPECTS SHALL BE GOVERNED BY THE LAWS OF THE STATE OF NEW JERSEY WITHOUT REGARD TO ITS PRINCIPLES OF CONFLICTS OF LAW.

Effective on the eighth calendar day following the date set forth below.

[[NYCORP:2654388v3:3800C:11/05/06--01:35 p]]

4

KOS PHARMACEUTICALS, INC.,

by

_____

Name:
Title:


EMPLOYEE,

_____

[NAME]
Date
Signed:_____

# EXHIBIT B

ACTION TAKEN BY
UNANIMOUS WRITTEN CONSENT OF THE BOARD OF DIRECTORS OF
KOS PHARMACEUTICALS, INC.

The undersigned, being the sole Director of Kos Pharmaceuticals, Inc., a Florida corporation (the "Corporation"), acting pursuant to the authority provided in Section 607.0821 of the Florida Business Corporation Act, does hereby adopt the following resolutions:

WHEREAS, pursuant to the Transaction Agreement between and among Abbott Laboratories, Parthenon Acquisition Corp., and Kos Pharmaceuticals, Inc., Abbott agreed to maintain and administer the severance benefits described in Section 6.5(d) of the company Disclosure Schedule as defined in the Transaction Agreement, with respect to any benefits afforded thereunder to any employees employed by the Corporation on December 15, 2006; and

WHEREAS, on December 15, 2006 (the "Closing Date") Abbott acquired the stock of the Corporation and the transferred Employees became employees of Abbott or one of its subsidiaries; and

WHEREAS, it is desirable to amend and restate the Kos Pharmaceuticals Change in Control Severance Plan (the "Plan") for maintenance and administration purposes, and to rename it the Abbott Severance Pay Plan for Employees of Kos Pharmaceuticals;

NOW THEREFORE BE IT RESOLVED, pursuant to the authority reserved to this Board, the Plan be and hereby is amended and restated in its entirety as shown in Exhibit A, effective as of December 15, 2006.

FURTHER RESOLVED, that the officers of the Corporation be, and each of them severally is, hereby authorized to execute, by and on behalf of the Corporation, any and all documents or authorizations and to take any further actions that he or she deems necessary or desirable to carry out the foregoing; and

FURTHER RESOLVED, that the execution of any document or authorization by any officer of the Corporation shall be conclusive evidence that the document or authorization has been authorized by the foregoing resolution.

_____
Thomas C. Freyman
Sole Director

Done at Abbott Park, Illinois
January 24, 2007

EXHIBIT A

## ABBOTT SEVERANCE PAY PLAN
## FOR EMPLOYEES OF KOS PHARMACEUTICALS

WHEREAS, pursuant to the Transaction Agreement (the "Transaction Agreement") between and among Abbott Laboratories ("Abbott"), Parthenon Acquisition Corporation, and Kos Pharmaceuticals, Inc. (the "Company"), dated November 5, 2006, as amended, Abbott agreed to maintain and administer the severance benefits described in Section 6.5(d) of the Company Disclosure Schedule as defined in the Transaction Agreement, with respect to any benefits afforded thereunder to any employees employed by the Company on December 15, 2006 (the "Transferred Employees"); and

WHEREAS, on December 15, 2006, (the "Closing Date"), Abbott acquired the stock of the Company and the Transferred Employees became employees of Abbott or one of its subsidiaries; and

WHEREAS, it now is considered desirable to amend and restate the Kos Pharmaceuticals Change in Control Severance Plan (the "Kos Plan") and to provide for the maintenance and administration thereof as hereinafter set forth; and

WHEREAS, pursuant to Section XIII of the Kos Plan, the Board of the Company may amend or modify the Kos Plan at any time, although not in a manner that is adverse to a participant without the prior written consent of the participant.

NOW, THEREFORE, pursuant to the authority reserved to the Board, the Kos Plan be and hereby is amended and restated in its entirety, and also renamed the Abbott Severance Pay Plan for Employees of Kos Pharmaceuticals, Inc. (the "Plan"), effective as of December 15, 2006, as set forth below.

I.    Definitions.  For purposes of this Plan, the following terms shall have the meanings set forth below:

(a)    "280G Gross-Up Payment" shall have the meaning set forth in Section V(a).

(b)    "Accounting Firm" shall have the meaning set forth in Section V(b).

(c)    "Accrued Rights" shall have the meaning set forth in Section IV.(a)(iv).

(d)    "Affiliate(s)" means, with respect to any specified Person, any other Person that, directly or indirectly, through one or more intermediaries, controls, is controlled by, or is under common control with, such specified Person.

(e)   "Annual Base Salary" means, with respect to any Participant, such Participant's annual rate of base salary in effect immediately prior to such Participant's Termination Date.

(f)   "Annual Bonus" means, with respect to any Participant and as of such Participant's Termination Date, 110% of the average of the regular annual cash bonuses (or, in the case of sales personnel, annual commissions), excluding special or one-time bonuses or commissions, actually paid to the Participant in each of the two full years prior to the year in which such Participant's Termination Date occurs; provided that if such Participant has not been employed for a sufficient length of time to have been eligible for two such bonuses or commissions (whether or not any bonus or commission was actually paid). "Annual Bonus" shall be calculated on the basis of the average of the regular annual cash bonuses or commissions (excluding special or one-time bonuses or commissions) actually paid to other employees of similar position in each of the two full years prior to the year in which the Participant's Termination Date occurs.

(g)   "Cause" means, with respect to any Participant, the occurrence of any one of the following:

(i)   the Participant is convicted of, or pleads guilty or nolo contendere to, (A) a misdemeanor involving moral turpitude or that involves mis-appropriation of the assets of the Company or a Subsidiary or (B) a felony;

(ii)   the Participant commits one or more acts or omissions constituting negligence, fraud or other misconduct that the Company reasonably and in good faith determines has a materially detrimental effect on the Company;

(iii)   the Participant continually and willfully fails, for at least 14 days following written notice from the Company, to perform substantially the Participant's employment (other than as a result of incapacity due to physical or mental illness or after delivery by the Participant of a Notice of Termination for Good Reason); or

(iv)   the Participant commits a material violation of any of the Company's material policies (including the Company's Code of Business Conduct and Ethics, as in effect from time to time) that the Company reasonably and in good faith determines is materially detrimental to the best interests of the Company.

(h)   "Code" means the Internal Revenue Code of 1986, as amended from time to time, and the regulations promulgated thereunder.

2

(i)     "Controlling Shareholders" means, collectively, the group of shareholders set forth in the Schedule 13D filed with the Securities and Exchange Commission on September 12, 2006, consisting of Michael Jaharis, Mary Jaharis, Wilson Point Holdings, LP, Cubs Management, LLC, Kos Investments, Inc., Kos Holdings, Inc., Kathryn Jaharis, Steven Jaharis and Jaharis Holdings, Inc, LLC.

(j)     "Disability" means, with respect to any Participant, that the Participant becomes eligible to receive income replacement benefits under any long term disability plan covering employees of the Company or its Subsidiaries.

(k)     "Effective Date" shall have the meaning set forth in Section XIII.

(l)     "Exchange Act" means the Securities Exchange Act of 1934, as amended from time to time, or any successor statute thereto.

(m)     "Excise Tax" means the excise tax imposed by Section 4999 of the Code, together with any interest or penalties imposed with respect to such tax.

(n)     "Extension Date" shall have the meaning set forth in Section XIII.

(o)     "Good Reason" means, with respect to any Participant and without such Participant's express written consent, the occurrence of any one or more of the following:

    (i)     a greater than 10% reduction of the Participant's annual base salary, or any material reduction in the total cash compensation that the Participant is eligible to earn, from the level in effect immediately prior to December 15, 2006.

    (ii)    any demotion or other significant reduction in the job responsibilities held by the Participant immediately prior to December 15, 2006, or any significant change to the reporting relationships of the Participant as in effect immediately prior to December 15, 2006: or

    (iii)   any change of the Participant's principal place of employment to a location more than (i) in the case of Participants who are not sales personnel, 65 miles from the Participant's principal place of employment immediately prior to December 15, 2006, and (ii) in the case of Participants who are sales personnel, 50 miles from the Participant's principal residence immediately prior to December 15, 2006,

The Participant's right to terminate employment for Good Reason shall not be affected by the Participant's incapacity due to physical or mental illness. A termination of employment by the Participant for Good Reason for purposes of this Plan shall be effectuated by giving the Company written notice ("Notice of Termination for Good Reason") of the termination setting forth in reasonable detail the specific conduct of the Company that constitutes Good Reason and

the specific provisions of this Plan on which the Participant relied.  Unless the parties agree otherwise, a termination of employment by the Participant for Good Reason shall be effective on the 30th day following the date when the Notice of Termination for Good Reason is given, unless the Company elects to treat such termination as effective as of an earlier date; provided, however, that so long as an event that constitutes Good Reason occurs during the Protection Period, for purposes of the payments, benefits and other entitlements set forth in Section IV.(a), the termination of the Participant's employment pursuant thereto shall be deemed to be a resignation for Good Reason during the Protection Period.

    (p)    "Notice of Termination for Good Reason" shall have the meaning set forth in Section I.(o).

    (q)    "Participant" shall have the meaning set forth in Section II.

    (r)    "Payment" means any payment, benefit or distribution (or combination thereof) by the Company, any of its Affiliates or any trust established by the Company or its Affiliates, to or for the benefit of a Participant, whether paid, payable, distributed, distributable or provided pursuant to this Plan or otherwise, including any payment, benefit or other right that constitutes a "parachute payment" within the meaning of Section 280G of the Code.

    (s)    "Person" means a "person" (as such term is used in Section 13(d) of the Exchange Act.

    (t)    "Protection Period" means the period commencing on December 15, 2006, and ending on the first anniversary thereof.

    (u)    "Release Effective Date" shall have the meaning set forth in Section IV.(a)(i).

    (v)    "Section 409A Tax" shall have the meaning set forth in Section VI.

    (w)    "Severance Multiple" means, with respect to any Participant, the number indicated on the chart set forth on Schedule A hereto based on such Participant's Years of Service and job classification; provided, however, that the Severance Multiple of (i) Participants who are classified as directors, managers or professionals shall not be less than 52, (ii) Participants who are classified sales personnel shall not be less than 39, and (iii) all other Participants shall not be less than 26.

    (x)    "Subsidiary" means any entity in which the Company, directly or indirectly, possesses 50% or more of the total combined voting power of all classes of its stock.

    (y)    "Successor" shall have the meaning set forth in Section X.

    (z)    "Termination Date" means the date on which the termination of a Participant's employment, in accordance with the terms of this Plan, is effective.

(aa)  "Underpayment" shall have the meaning set forth in Section V.(b).

(bb)  "Years of Service" means, with respect to any Participant, the number of full years that such Participant has been an employee of the Company or its Subsidiaries as of such Participant's Termination Date. For purposes hereof, "year" means any period of 12 consecutive calendar months, without regard to any short-term leave, parental leave or other approved absence.

II.  Eligibility. Participants in this Plan ("Participants") are those individuals who are classified as employees of the Company and its Subsidiaries who are employed by the Company or its Subsidiaries on or following the Effective Date, other than any such employee who enters into an individual severance agreement with the Company: provided, however. that in the case of any such employee who is or becomes a Participant prior to December 15, 2006, but who is not employed by the Company or its Subsidiaries on December 15, 2006, such employee shall not be treated as a Participant for purposes of this Plan.

III.  Equity Compensation Awards. Effective as of December 15, 2006, notwithstanding any provision to the contrary in any of the Company's equity-based. equity-related or other long-term incentive compensation plans, practices, policies and programs (including the Company's 1996 Stock Option Plan and 2006 Incentive Plan) or any award agreements thereunder, (a) all outstanding stock options, stock appreciation rights, restricted shares and similar rights and awards then held by each Participant that are unexercisable or otherwise unvested as of December 15, 2006, shall automatically become fully vested and immediately exercisable, as the case may be, (b) all outstanding equity-based, equity-related and other long-term incentive awards then held by such Participant as of December 15, 2006, that are subject to performance-based vesting criteria shall automatically become fully vested and earned at a deemed performance level equal to the maximum performance level with respect to such awards and (c) all other outstanding equity-based, equity-related and long-term incentive awards. to the extent not covered by the foregoing clause (a) or (b), held on December 15, 2006, by such Participant that are unvested or subject to restrictions or forfeiture shall automatically become fully vested and all restrictions and forfeiture provisions related thereto shall lapse.

IV.  Termination of Employment.

(a)  Termination During the Protection Period by the Company Without Cause or by the Participant for Good Reason. Subject to Section IV.(a)(v) if a Participant's employment is terminated either (x) by the Company or its Subsidiaries other than for Cause, death or Disability or (y) by resignation of the Participant with Good Reason, in each case during the Protection Period, then the Participant shall be entitled to the following payments and benefits:

(i)  Severance Pay. The Company shall pay the Participant an amount equal to the sum of (A) a number of weeks of the Participant's Annual Base Salary (without regard to any reduction giving rise to Good Reason) equal to the Severance Multiple and (B) the

Participant's Annual Bonus multiplied by a fraction the numerator of which is the Severance Multiple and the denominator of which is 52. which sum shall be payable in a lump-sum payment on the tenth business day after the date the release described in Section IV.(a)(v) becomes effective and irrevocable (the "Release Effective Date"); provided, however, that such amount shall be paid in lieu of, and the Participant hereby waives the right to receive, any other cash severance payment relating to salary or bonus continuation the Participant is otherwise eligible to receive upon termination of employment under any severance plan, practice, policy or program of the Company or any Subsidiary.

(ii)   Prorated Annual Bonus.  The Company shall pay the Participant an amount equal to the product of (A) the Participant's target annual bonus for the year in which the Termination Date occurs (assuming all individual and business criteria are met at target levels) and (B) a fraction, the numerator of which is the number of days in the current fiscal year through such Termination Date. and the denominator of which is 365, in a lump-sum payment on the tenth business day after the Release Effective Date.

(iii)   Continued Welfare Benefits.  The Company shall continue to provide for a number of weeks equal to the Severance Multiple medical and welfare benefits to the Participant and the Participant's spouse and dependents (in each case, as provided in the applicable plan) at least equal to the levels of benefits provided by the Company and its Subsidiaries immediately prior to December 15, 2006. Nothing in this Section IV.(a)(iii) shall operate to reduce, or be construed as reducing, the Participant's group health plan continuation rights under the Consolidated Omnibus Budget Reconciliation Act of 1985, as amended, in any manner.

(iv)   Accrued Rights.  The Participant shall be entitled to (A) payments of any unpaid annual base salary. annual bonus. commissions or other amounts earned or accrued through the Participant's Termination Date and (B) except as provided in Section IV.(a)(i), any payments or benefits explicitly set forth in any other agreements, benefit plans, practices, policies. arrangements and programs to which the Participant is a party or in which the Participant participates (the rights to such payments, the "Accrued Rights").

(v)   Release of Claims.  Notwithstanding any provision of this Plan to the contrary, the Company shall not be obligated to make any payments or provide any benefits described in this Section IV.(a), other than payments or benefits in respect of the Accrued Rights,

6

unless and until such time as the Participant has executed and delivered a Separation Agreement and Release substantially in the form of Attachment A hereto and such release has become effective and irrevocable in accordance with its terms.

(b)   Other Termination. If a Participant's employment is terminated in any circumstance not described in Section IV.(a) (including as a result of death or Disability), the Participant shall not be entitled to any compensation or benefits described in Section IV.(a) other than any payments with respect to the Accrued Rights.

V.   Certain Additional Payments by the Company.

(a)   Notwithstanding anything in this Plan to the contrary and except as set forth below, in the event it shall be determined that any Payment that is paid or payable to or for the benefit of a Participant during the period of this Plan's effectiveness would be subject to the Excise Tax, such Participant shall be entitled to receive an additional payment (a "280G Gross-Up Payment") in an amount such that, after payment by such Participant of all taxes (and any interest or penalties imposed with respect to such taxes), including any income and employment taxes (and any interest and penalties imposed with respect thereto) and Excise Taxes imposed upon the 280G Gross-Up Payment, such Participant retains an amount of the 280G Gross-Up Payment equal to the Excise Tax imposed upon such Payments. The Company's obligation to make 280G Gross-Up Payments under this Section V.(a) shall not be conditioned upon a Participant's termination of employment and shall survive and apply after such Participant's termination of employment. At the time of any Payment during the period of this Plan's effectiveness, the Company shall provide each Participant a written description of the application of the Excise Tax (if any) to such Payment.

(b)   Subject to the provisions of Section V.(c), all determinations required to be made under this Section V, including whether and when a 280G Gross-Up Payment is required, the amount of such 280G Gross-Up Payment and the assumptions to be utilized in arriving at such determination, shall be made in accordance with the terms of this Section V by a nationally recognized certified public accounting firm that shall be designated by the Company (other than the Company's regular auditor) (the "Accounting Firm"). The Accounting Firm shall provide detailed supporting calculations both to the Company and the applicable Participant within 15 business days of the receipt of notice from the Participant that there has been a Payment or such earlier time as is requested by the Company. For purposes of determining the amount of any 280G Gross-Up Payment, each Participant shall be deemed to pay Federal income tax at the highest marginal rate applicable to individuals in the calendar year in which any such 280G Gross-Up Payment is to be made and deemed to pay state and local income taxes at the highest marginal rates applicable to individuals in the state or locality of the Participant's residence or place of employment in the calendar year in which any such 280G Gross-Up

7

Payment is to be made, net of the maximum reduction in Federal income taxes that can be obtained from deduction of state and local taxes, taking into account limitations applicable to individuals subject to Federal income tax at the highest marginal rate. All fees and expenses of the Accounting Firm shall be borne solely by the Company. Any 280G Gross-Up Payment, as determined pursuant to this Section V, shall be paid by the Company to the applicable Participant within 5 business days of the receipt of the Accounting Firm's determination. If the Accounting Firm determines that no Excise Tax is payable by such Participant, it shall so indicate to such Participant in writing. Any determination by the Accounting Firm shall be binding upon the Company and the applicable Participant. As a result of the uncertainty in the application of the Excise Tax. at the time of the initial determination by the Accounting Firm hereunder, it is possible that the amount of the 280G Gross-Up Payment determined by the Accounting Firm to be due to a Participant, consistent with the calculations required to be made hereunder, will be lower than the amount actually due, including any interest and penalties (an "Underpayment"). In the event the Company exhausts its remedies pursuant to Section V.(c) and such Participant thereafter is required to make a payment of any Excise Tax, the Accounting Firm shall determine the amount of the Underpayment that has occurred and any such Underpayment shall be paid by the Company to such Participant within 5 business days of the receipt of the Accounting Firm's determination.

(c). Each Participant shall notify the Company in writing of any written claim by the Internal Revenue Service that, if successful, would require the payment by the Company of a 280G Gross-Up Payment. Such notification shall be given as soon as practicable, but no later than 10 business days after the Participant is informed in writing of such claim. Failure to give timely notice shall not prejudice any Participant's right to 280G Gross-Up Payments and rights of indemnity under this Section V, unless, and solely to the extent that, the Company has been prejudiced in a material respect by such failure. Each Participant shall apprise the Company of the nature of such claim and the date on which such claim is requested to be paid. No Participant shall pay such claim prior to the expiration of the 30-day period following the date on which the Participant gives such notice to the Company (or such shorter period ending on the date that any payment of taxes with respect to such claim is due). If the Company notifies a Participant in writing prior to the expiration of such period that the Company desires to contest such claim, the Participant shall (i) give the Company any information reasonably requested by the Company relating to such claim, (ii) take such action in connection with contesting such claim as the Company shall reasonably request in writing from time to time, including accepting legal representation with respect to such claim by an attorney reasonably selected by the Company, (iii) cooperate with the Company in good faith in order effectively to contest such claim and (iv) permit the Company to participate in any proceedings relating to such claim; provided, however, that the Company shall bear and pay directly all costs and expenses (including additional income taxes, interest and penalties) incurred in connection with such contest, and shall indemnify and hold the Participant

harmless, on an after-tax basis, for any Excise Tax or income tax (including interest or penalties) imposed as a result of such representation and payment of costs and expenses. Without limitation on the foregoing provisions of this Section V.(c), the Company shall control all proceedings taken in connection with such contest, and, at its sole discretion, may pursue or forgo any and all administrative appeals proceedings, hearings and conferences with the applicable taxing authority in respect of such claim and may, at its sole discretion, either direct the Participant to pay the tax claimed and sue for a refund or contest the claim in any permissible manner, and the Participant agrees to prosecute such contest to a determination before any administrative tribunal, in a court of initial jurisdiction and in one or more appellate courts, as the Company shall determine; provided, however, that (A) if the Company directs the Participant to pay such claim and sue for a refund, the Company shall advance the amount of such payment to the Participant, on an interest-free basis, and shall indemnify and hold the Participant harmless, on an after-tax basis, from any Excise Tax or income tax (including interest or penalties) imposed with respect to such advance or with respect to any imputed income in connection with such advance and (B) if such contest results in any extension of the statute of limitations relating to payment of taxes for the taxable year of the Participant with respect to which such contested amount is claimed to be due, such extension must be limited solely to such contested amount. Furthermore, the Company's control of the contest shall be limited to issues with respect to which the 280G Gross-Up Payment would be payable hereunder, and each Participant shall be entitled to settle or contest, as the case may be, any other issue raised by the Internal Revenue Service or any other taxing authority.

(d)   If, after the receipt by a Participant of an amount advanced by the Company pursuant to Section V.(c), the Participant becomes entitled to receive any refund with respect to such claim, the Participant shall (subject to the Company's complying with the requirements of Section V.(c)) promptly pay to the Company the amount of such refund received (together with any interest paid or credited thereon after taxes applicable thereto). If, after the receipt by a Participant of an amount advanced by the Company pursuant to Section V.(c) a determination is made that the Participant shall not be entitled to any refund with respect to such claim and the Company does not notify the Participant in writing of its intent to contest such denial of refund prior to the expiration of the 30-day period after such determination, then such advance shall be forgiven and shall not be required to be repaid and the amount of such advance shall offset, to the extent thereof, the amount of 280G Gross-Up Payment required to be paid.

VI.   Section 409A. It is the intention of the Company that the provisions of this Plan comply with Section 409A of the Code, and all provisions of this Plan shall be construed and interpreted in a manner consistent with Section 409A of the Code. To the extent necessary to avoid imposition of any additional tax or interest penalties under Section 409A (such tax and

9

interest penalties, a "Section 409A Tax"), notwithstanding the timing of payment provided in any other Section of this Plan, the timing of any payment, distribution or benefit pursuant to this Plan shall be subject to a six-month delay in a manner consistent with Section 409A(a)(2)(B)(i) of the Code; provided that if a Participant dies during such six-month period, any such delayed payments shall not be further delayed, and shall be immediately payable to the Participant's devisee, legatee or other designee or, should there be no such designee, to the Participant's estate in accordance with the applicable provisions of this Plan. From and after the Effective Date, (i) the Company shall administer and operate this Plan in compliance with Section 409A of the Code and any rules, regulations or other guidance promulgated thereunder as in effect from time to time and (ii) in the event that the Company determines that any provision of this Plan does not comply with Section 409A of the Code or any such rules, regulations or guidance and that as a result any Participant may become subject to a Section 409A Tax, the Company shall amend or modify such provision to avoid the application of such Section 409A Tax, provided that such amendment or modification shall not reduce the economic value to the Participants of such provision.

VII.   No Mitigation or Offset; Enforcement of this Plan.

(a)   The Company's obligation to make the payments provided for in this Plan and otherwise to perform its obligations hereunder shall not be affected by any set-off, counterclaim, recoupment, defense or other claim, right or action which the Company may have against any Participant or others. In no event shall any Participant be obligated to seek other employment or take any other action by way of mitigation of the amounts payable to the Participant under any of the provisions of this Plan and, except as otherwise expressly provided for in this Plan, such amounts shall not be reduced whether or not the Participant obtains other employment.

(b)   In the event that any Participant is the prevailing party in any contest, dispute or proceeding regarding the Participant's rights pursuant to this Plan, the Company shall reimburse, upon the Participant's written demand, any and all reasonable legal fees and expenses that the Participant may incur as a result of such contest, dispute or proceeding (including as a result of any contest regarding the amount of any payment owed pursuant to this Plan), and shall indemnify and hold the Participant harmless, on an after-tax basis, for any tax (including Excise Tax) imposed on the Participant as a result of payment by the Company of such legal fees and expenses.

VIII.   Non-Exclusivity of Rights. Except as specifically provided in Sections II and IV.(a)(i) nothing in this Plan shall prevent or limit a Participant's continuing or future participation in any plan, practice, policy or program provided by the Company or a Subsidiary for which the Participant may qualify, nor shall anything in this Plan or the accompanying Separation Agreement and Release limit or otherwise affect any rights the Participant may have under any contract or agreement with the Company or a Subsidiary. Vested benefits and other amounts a Participant is otherwise entitled to receive under any incentive compensation (including any equity award agreement), deferred compensation, retirement, pension or other

10

plan, practice, policy or program of, or any contract or agreement with, the Company or a Subsidiary shall be payable in accordance with the terms of each such plan, practice, policy, program, contract or agreement, as the case may be, except as explicitly modified by this Plan.

IX.    Withholding. The Company may deduct and withhold from any amounts payable under this Plan such Federal, state, local, foreign or other taxes as are required to be withheld pursuant to any applicable law or regulation.

X.    Successors. This Plan shall bind any successor (a "Successor") to all or substantially all of the business or assets of the Company (whether direct or indirect, by purchase, merger, consolidation or otherwise), in the same manner and to the same extent that the Company would have been obligated under this Plan if no such succession had taken place. In the case of any transaction in which a Successor would not, pursuant to the foregoing provision or by operation of law, be bound by this Plan, the Company shall require such Successor expressly and unconditionally to assume and agree to perform the Company's obligations under this Plan, in the same manner and to the same extent that the Company would have been required to perform such obligations if no such succession had taken place. The term "Company", as used in this Plan, shall mean the Company as hereinbefore defined and any Successor and any assignee to such business or assets which by reason hereof becomes bound by this Plan.

XI.    Default in Payment. Any payment not made within ten business days after it is due in accordance with this Plan shall thereafter bear interest, compounded annually, at the prime rate in effect from time to time at Citibank, N.A.. or any successor thereto.

XII.    GOVERNING LAW. THIS PLAN SHALL BE DEEMED TO BE MADE IN THE STATE OF NEW JERSEY, AND THE VALIDITY, INTERPRETATION, CONSTRUCTION AND PERFORMANCE OF THIS PLAN IN ALL RESPECTS SHALL BE GOVERNED BY THE LAWS OF THE STATE OF NEW JERSEY WITHOUT REGARD TO ITS PRINCIPLES OF CONFLICTS OF LAW.

XIII.    Duration; Termination. This Plan shall become effective November 5, 2006. (the "Effective Date"), and shall remain in effect until the second anniversary thereof. Notwith-standing the foregoing this Plan shall continue in full force and effect in accordance with its terms and shall not terminate or expire until all the Company's obligations to all Participants have been satisfied in full. This Plan shall not be effective with respect to any change in control of the Company following the Effective Date and the Participants shall not be entitled to any payments or benefits pursuant to this Plan. For this purpose. a change in control shall mean any corporation or other entity or group (within the meaning of Section 13(d)(3) or 14(d)(2) of the Exchange Act) -- other than Abbott or any Subsidiary of Abbott -- becoming the beneficial owner, directly or indirectly, of all of the outstanding shares of common stock of the Company.

XIV.    Amendment or Modification. The Board may amend or modify this Plan at any time; provided, however, that except as specifically required by Section VI, on and after December 15, 2006, this Plan may not be amended at any time in a manner that is adverse to a Participant without the prior written consent of such Participant. The failure of a Participant to

11

insist upon strict adherence to any term of this Plan on any occasion shall not be considered a waiver of such Participant's rights or deprive such Participant of the right thereafter to insist upon strict adherence to that term or any other term of this Plan. No failure or delay by any Participant in exercising any right or power hereunder will operate as a waiver thereof, nor will any single or partial exercise of any such right or power, or any abandonment of any steps to enforce such right or power, preclude any other or further exercise thereof or the exercise of any other right or power.

      XV.   <u>Severability</u>. If any term or provision of this Plan is invalid, illegal or incapable of being enforced by any applicable law or public policy, all other conditions and provisions of this Plan shall nonetheless remain in full force and effect.

      XVI.   <u>Survival</u>. The provisions of this Plan, including Sections IV, V, VI, VII, X, and XI, shall survive and remain binding and enforceable, notwithstanding the expiration or termination of this Plan, the termination of a Participant's employment with the Company for any reason or any settlement of the financial rights and obligations arising from such Participant's participation hereunder, to the extent necessary to preserve the intended benefits of such provisions.

      XVII.   <u>Notices</u>. All notices or other communications required or permitted by this Plan will be made in writing and all such notices or communications will be deemed to have been duly given when delivered or (unless otherwise specified) mailed by United States certified or registered mail, return receipt requested, postage prepaid, addressed as follows:

      (a)    If to the Company:  Abbott Laboratories
                              Employee Relations
                              Abbott Laboratories, 200 Abbott Park Road, AP51
                              Abbott Park, IL 60064-6222

      (b)    If to a Participant, to such Participant's address as most recently supplied to the Company and set forth in the Company's records;

or to such other address as any party may have furnished to the other in writing in accordance herewith, except that notices of change of address shall be effective only upon receipt.

      XVIII.  <u>Headings and References</u>. The headings of this Plan are inserted for convenience only and neither constitute a part of this Plan nor affect in any way the meaning or interpretation of this Plan. When a reference in this Plan is made to a Section, such reference shall be to a Section of this Plan unless otherwise indicated.

XIX.   Interpretation.  For purposes of this Plan, the words "include" and "including", and variations thereof, shall not be deemed to be terms of limitation but rather shall be deemed to be followed by the words "without limitation".  The term "or" is not exclusive.  The word "extent" in the phrase "to the extent" shall mean the degree to which a subject or other thing extends, and such phrase shall not mean simply "if".

XX.   Claim and Appeal Procedures.  All claims for unpaid benefits must be made in writing and will be decided by the Committee under the Abbott Abbott Severance Pay Plan for Employees of Kos Pharmaceuticals (the "Committee).  The Committee shall be appointed by the Senior Vice President, Human Resources, Abbott Laboratories, and may delegate its authority under the Plan.

All appeals of adverse decisions by the Committee must be made in writing.  The Plan Administrator of this Plan is the Divisional Vice President, Employee and Labor Relations.  The Plan Administrator will make a full and fair review of the appeal and may require additional documents as it deems necessary in making such a review.

XXI.   Discretionary Authority.  The Plan Administrator is the named fiduciary of the Plan within the meaning of ERISA.  The Plan Administrator has the discretionary authority to interpret all Plan provisions and to determine all issues arising under the Plan, including issues of eligibility, coverage and benefits.  The Plan Administrator's failure to enforce any provision of the Plan will not affect its right later to enforce the provision or any other provision of the Plan.  The Plan Administrator may delegate its responsibilities under the Plan.

## SEPARATION AGREEMENT AND RELEASE

1.   Release.   For good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the undersigned, with the intention of binding himself/herself, his/her heirs, executors, administrators and assigns, [INSERT NAME] does hereby release and forever discharge Abbott Laboratories, Kos Pharmaceuticals, Inc., a subsidiary of Abbott Laboratories (collectively the "Company" or "Abbott"), and its or their parents, subsidiaries, affiliates, predecessors, successors, and/or assigns, past, present, and future, together with its and their officers, directors, executives, agents, employees, and employee benefits plans (and the trustees, administrators, fiduciaries and insurers of such plans), past, present, and future (collectively, the "Released Parties"), from any and all claims, actions, causes of action, demands, rights, damages, debts, accounts, suits, expenses, attorneys' fees and liabilities of whatever kind or nature in law, equity, or otherwise, whether now known or unknown (collectively, the "Claims"), which the undersigned now has, owns or holds, or has at any time heretofore had, owned or held against any Released Party, from the beginning of time to the date of the [INSERT NAME]'s execution of this Separation Agreement and Release, including without limitation, any Claims arising out of or in any way connected with the undersigned's employment relationship with the Company, its subsidiaries, predecessors or affiliated entities, or the termination thereof, under any Federal, state or local statute, rule, or regulation, or principle of common, tort or contract law, including but not limited to, the Family and Medical Leave Act of 1993, as amended (the "FMLA"), 29 U.S.C. §§ 2601 et seq., Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 2000e et seq., the Age Discrimination in Employment Act of 1967, as amended, 29 U.S.C. §§ 621 et seq., the Americans with Disabilities Act of 1990, as amended, 42 U.S.C. §§ 12101 et seq., the Worker Adjustment and Retraining Notification Act of 1988, as amended, 29 U.S.C. §§ 2101 et seq., the Employee Retirement Income Security Act of 1974, as amended, 29 U.S.C. §§ 1001 et seq., and all other Federal, state, or local statutes, regulations or laws (including but not limited to the New Jersey Conscientious Employee Protection Act, if applicable); provided, however, that nothing herein shall release the Company of its obligations under Abbott Severance Pay Plan for Employees of Kos Pharmaceuticals (including the Accrued Rights (as defined therein)).  Except as set forth in Section II below, the undersigned understands that, as a result of executing this Separation Agreement and Release, he/she will not have the right to assert that the Company or any other Released Party unlawfully terminated his/her employment or violated any of his/her rights in connection with his/her employment or otherwise.

The undersigned affirms that he/she is not presently party to any Claim, complaint or action against any Released Party in any forum or form and that he/she knows of no facts which may lead to any Claim, complaint or action being filed against any Released Party in any forum by the undersigned or by any agency, group, etc.  The undersigned further affirms that he/she has been paid and/or has received all leave (paid or unpaid), compensation, wages, bonuses, commissions, and/or benefits to which he/she may be entitled and that no other leave (paid or unpaid), compensation, wages, bonuses, commissions and/or benefits are due to him/her from the Company and its subsidiaries, except as specifically provided in this Separation Agreement and Release.  The undersigned furthermore affirms that he/she has no known workplace injuries or occupational diseases and has been provided and/or has not been denied any leave requested under the FMLA.  If any agency or court assumes jurisdiction of any such Claim, complaint or action against any Released Party on behalf of the undersigned, the undersigned hereby waives any right to individual monetary or other relief.

The undersigned further declares and represents that he/she has carefully read and fully understands the terms of this Separation Agreement and Release and that, through this document, he/she is hereby advised to consult with an attorney prior to executing this Separation Agreement and Release, that he/she may take up to and including 45 days from receipt of this Separation Agreement and Release, to consider whether to sign this Separation Agreement and Release, that he/she may revoke this Separation Agreement and Release within seven calendar days after signing it by delivering to the Company written notification of revocation (and that this Separation Agreement and Release shall not become effective or enforceable until the expiration of such revocation period), and that he/she knowingly and voluntarily, of his/her own free will, without any duress, being fully informed and after due deliberate action, accepts the terms of and signs the same as his own free act.

II.    Protected Rights.  The Company and the undersigned agree that nothing in this Separation Agreement and Release is intended to or shall be construed to affect, limit or otherwise interfere with any non-waivable right of the undersigned under any Federal, state or local law, including the right to file a charge or participate in an investigation or proceeding conducted by the Equal Employment Opportunity Commission ("EEOC") or to exercise any other right that cannot be waived under applicable law.  The undersigned is releasing, however, his/her right to any monetary recovery or relief should the EEOC or any other agency pursue Claims on his/her behalf.  Further, should the EEOC or any other agency obtain monetary relief on his/her behalf, the undersigned assigns to the Company all rights to such relief.

III.    Third-Party Litigation.  The undersigned agrees to be available to the Company and its affiliates on a reasonable basis in connection with any pending or threatened claims, charges or litigation in which the Company or any of its affiliates is now or may become involved, or any other claims or demands made against or upon the Company or any of its affiliates, regardless of whether or not the undersigned is a named defendant in any particular case.

IV.    Return of Property.  The undersigned shall return to the Company on or before [10 DAYS AFTER NOTICE OF TERMINATION DATE], all property of the Company in the undersigned's possession or subject to the undersigned's control, including without limitation any laptop computers, keys, credit cards, cellular telephones and files.  The undersigned shall not alter any of the Company's records or computer files in any way after [NOTICE OF TERMINATION DATE].

V.    Confidential Information.  The undersigned acknowledges that Confidential Information (as defined below) is a valuable asset of the Company and that unauthorized disclosure or utilization thereof could be detrimental to the Company.  The undersigned, therefore, shall not, after the term of employment with the Company, disclose in any way or to any extent, to any person or organization other than the Company, or utilize for the benefit or profit of the undersigned or any other person or organization other than the Company, any Confidential Information, except (a) as may be authorized in writing in advance by the Company; (b) is publicly available or becomes publicly available other than through a breach of this document by the undersigned or, based on the undersigned's knowledge, the breach of this document by others; and (c) upon prior notification to the Company, the undersigned may be required by law to disclose.  "Confidential Information" means information disclosed — whether orally or in writing — to the undersigned, or otherwise known to the undersigned as a direct or indirect result of his or her employment by the Company, concerning (i) the Company's

2

products, patent applications, research activities, formulations, processes, protocols, procedures, other intellectual properties, machines, services, and all matters having to do with the business or operations of the Company, including, but not limited to, all information of any type related to research, product development, manufacturing, quality matters, purchasing, finance, data processing, engineering, facilities, marketing, merchandising and selling, personnel, organization matters, policy matters, legal and other corporate affairs and (ii) information of any type about any third party with which the Company is in technical or commercial cooperation, acquired by the undersigned, directly or indirectly, in connection with his or her employment by the Company. Included in the foregoing definition by way of illustration, but not limitation, are such items as research projects, findings or reports, business plans and projections, formulae, processes, methods of manufacture, computer programs, sales, costs, pricing data, regulatory matters, operating procedures, information about employees and personnel practices, and lists of investigators, consultants, suppliers and customers. The undersigned agrees not to remove any Confidential Information from the Company. not to request that others do so on the undersigned's behalf and to return any Confidential Information currently in the undersigned's possession to the Company.

VI.   Severability. If any term or provision of this Separation Agreement and Release is invalid, illegal or incapable of being enforced by any applicable law or public policy, all other conditions and provisions of this Separation Agreement and Release shall nonetheless remain in full force and effect so long as the economic and legal substance of the transactions contemplated by this Separation Agreement and Release is not affected in any manner materially adverse to any party.

VII.   GOVERNING LAW. THIS SEPARATION AGREEMENT AND RELEASE SHALL BE DEEMED TO BE MADE IN THE STATE OF NEW JERSEY, AND THE VALIDITY, INTERPRETATION, CONSTRUCTION AND PERFORMANCE OF THIS AGREEMENT IN ALL RESPECTS SHALL BE GOVERNED BY THE LAWS OF THE STATE OF NEW JERSEY WITHOUT REGARD TO ITS PRINCIPLES OF CONFLICTS OF LAW.

Effective on the eighth calendar day following the date set forth below.

ABBOTT LABORATORIES, AND KOS
PHARMACEUTICALS, INC., A
SUBSIDIARY OF ABBOTT

by

Name: _____
Title:
EMPLOYEE,

[NAME] _____
Date
Signed:_____

Schedule A

| SEVERANCE MULTIPLE | | | |
|---|---|---|---|
| Years of Service | Directors, Managers and Professionals | Sales Personnel | Others |
| Less than 1 | 6 | 3 | 3 |
| 1 Year but less than 2 | 9 | 4.5 | 3 |
| 2 Years but less than 3 | 12 | 6 | 6 |
| 3 Years but less than 4 | 18 | 9 | 9 |
| 4 Years but less than 5 | 24 | 12 | 12 |
| 5 Years but less than 6 | 30 | 15 | 15 |
| 6 Years but less than 7 | 36 | 21 | 18 |
| 7 Years but less than 8 | 42 | 27 | 21 |
| 8 Years but less than 10 | 48 | 33 | 24 |
| 10 Years but less than 15 | 54 | 39 | 27 |
| 15 or more Years | 60 | 45 | 33 |